**Affirmed and Opinion filed July 26, 2018.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-18-00154-CV

---

## IN THE INTEREST OF E.R., A CHILD

---

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 87661-F**

---

## O P I N I O N

This accelerated appeal arises from a final decree in a suit seeking termination of the parent-child relationship. *See* Tex. Fam. Code Ann. § 109.002(a-1) (West 2014 & Supp. 2017). Following a jury trial, the trial court terminated the parental rights of appellant J.R. (Mother) with respect to her son, Enrique,[1] as well as the rights of Enrique's unknown father. The court appointed the Texas Department of Family and Protective Services (the Department) as Enrique's managing conservator.

---

[1] We use pseudonyms or initials to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

On appeal, Mother challenges the sufficiency of the evidence to support the jury's finding that termination of Mother's parental rights is in Enrique's best interest. Though she does not raise independent issues regarding the jury's findings on the predicate grounds for termination, within her best-interest argument she contends the evidence was insufficient to support those findings. She also asserts the trial court abused its discretion in naming the Department as Enrique's managing conservator.

We conclude legally and factually sufficient evidence supports the jury's verdict. The evidence supports findings that (1) Mother has a mental or emotional illness or a mental deficiency that renders her unable to provide for Enrique's physical, emotional, and mental needs and that, in all reasonable probability, will continue to render her unable to provide for Enrique's needs until he turns eighteen; and (2) termination of Mother's parental rights is in Enrique's best interest. We also conclude the trial court did not abuse its discretion in naming the Department as Enrique's managing conservator. Therefore, we affirm the trial court's judgment.

BACKGROUND

A.    Removal

The Department received a referral on July 1, 2016, concerning one-day-old Enrique. The referral indicated 38-year-old Mother was intellectually disabled and the identity of Enrique's father was unknown. Mother allegedly said she could not return to her residence "due to her brother and nephew." The person making the referral was concerned Enrique did not have a safe home and Mother might not be able to care for him adequately due to her intellectual disability.

Department investigator Jesse Dedman visited Mother and Enrique in the hospital on July 2. Dedman characterized Mother as "confused" and noted Mother said she did not know where she was going to go when she was discharged from the

2

hospital. He spoke with Grandmother, Mother's mother and guardian, who confirmed Mother was not permitted to return to her home but said she did not know why. Dedman discovered the Department had investigated Mother previously due to allegations of negligent supervision and sexual abuse of her nephews. The allegations were ruled "reason to believe." Dedman's primary concern was the uncertainty of whether Mother and Enrique had a safe place to go. He ensured the hospital would not release Enrique without knowing where he was going.

Department investigator Lesly Damian-Murray took over the case when Enrique was one week old. A hospital social worker told Damian-Murray she "had concerns" with releasing Enrique to Grandmother because Grandmother had allowed Mother to "go out with guys" despite Mother's intellectual disability. Over the next few weeks, Damian-Murray learned Mother and Grandmother were living in a car, did not have a safe home for Enrique, and did not know the identity of Enrique's father. At trial, though, Grandmother denied anyone from the Department spoke with her about housing.

Enrique remained in the hospital until he was almost four weeks old. During that time, he underwent hernia surgery and had a gastrostomy tube (also referred to as a G-tube or feeding tube) placed. Hospital staff indicated Enrique would need special care after discharge due to his feeding tube, among other things. Grandmother and Damian-Murray agreed Mother would not be able to care for Enrique due to Mother's intellectual disability. Enrique's nurses tried to teach Grandmother to manage Enrique's feeding tube, but she refused. She testified she refused because she feared she would hurt Enrique by handling the tube improperly.

Because she had not found a suitable adult to care for Enrique, Damian-Murray removed Enrique when he was discharged and placed him in a foster home. The foster mother was a nurse specializing in pediatric gastroenterology, including

3

feeding tubes.

The next day, the Department filed its petition for protection of a child, for conservatorship, and for termination. The trial court signed orders naming the Department as Enrique's temporary sole managing conservator, appointing an attorney ad litem for Mother, and setting a full adversary hearing. At the hearing, Mother agreed to the Department's continuing managing conservatorship of Enrique. The trial court ordered Enrique to be removed from Mother's care and appointed the Department as his temporary managing conservator. The court signed an order requiring Mother to comply with any service plan by the Department. The service plan would identify the goals she needed to achieve and tasks and services she needed to complete before Enrique could be returned to her care.

## B. Trial

A jury trial was held in January 2018. Three Department employees, a psychologist, Enrique's foster mother, Grandmother, two of Mother's siblings, and a family friend testified. The documentary evidence includes Damian-Murray's affidavit concerning Enrique's removal, Mother's family service plan, several pretrial orders, documents regarding Mother's criminal history, and a psychological evaluation of Mother.

### 1. Enrique

#### a. Feeding tube

Enrique's foster mother, Molly, is a licensed vocational nurse (LVN) with specialized knowledge regarding pediatric gastroenterology, including feeding tubes. The trial court declared Molly to be an expert with regard to "treatment," "follow-up," and "pediatrics and GI issues."

As a newborn, Enrique was diagnosed with laryngomalacia, a softening of the

tissues of the larynx (voice box). That condition prevented Enrique from swallowing properly, which meant he could not receive his nutrition by mouth. As a result, the hospital inserted a feeding tube into Enrique's stomach. The tube was controlled by a machine that nourished him on a continuous, slow drip.

The Department placed Enrique in Molly's care when he was one month old. At that time, he required almost constant care. Molly explained:

> [W]e have to attach the feeding tube, an actual tube that connects. He has a G-button—that's gastrostomy tube—in his stomach. So, we have to let the air back out, which this is frequently—when he first came, he would cry a lot because he needed to let that gas out because he was swallowing too much air. So, we would have to release that in order to keep any food down. If we didn't do that, he would usually vomit or be crying because of pain.

Enrique could tolerate only one ounce of formula at a time, so he had to be fed every two to three hours. Molly testified how difficult it was to feed him:

> [W]hen he was one month, it was constant—constantly having to work with him just to get in that one ounce. You put a little bit in and we might have to let out some gas, try to put a little bit more in and let out some gas.

> And then the feeding machine itself, you have to clean out the feeding bag, hook up the formula to the bag, set it to the proper setting that it's dripping in slowly, when he didn't—when he could tolerate it. So, it was pretty much every couple—two hours throughout the 24-hour period. So, that could be up to 12 times a day.

> And in between that, he may still be upset because his stomach was hurting. So, we would have to feed him in between that. So, it was an ongoing—an ongoing process.

Even Molly, who had the relevant expertise, found it challenging to take care of Enrique in the beginning. Her husband and friend helped her. After several weeks, Enrique was approved for 40 hours a week of in-home nursing care. He was five

months old before he regularly gained sufficient weight for his age.

Due to Enrique's feeding tube, he has not been able to attend daycare. Molly explained the daycare she used for her two sons will not accept high-risk children with complex health issues.

Molly testified a person would need specialized training to care for a baby with a feeding tube. In addition to knowing how to handle routine feedings, the person would need to be able to address emergencies, such as correcting the placement of the G-button if it gets dislodged. At the Department's request, Molly stood ready to teach Enrique's family how to handle his feeding tube.

### b. Progress through trial

Enrique's ability to ingest nutrition improved significantly during the time he was in Molly's care. Roughly 18 months old at trial, Enrique could drink from a bottle himself and ingest six to eight fluid ounces at a time. He was beginning to eat solid foods. He received the rest of his nutrition overnight through his feeding tube.

The primary feeding challenge at the time of trial was preventing Enrique, a curious and active toddler, from playing with his feeding tube and G-button. Molly testified the formula can spill out and the G-button can become dislodged if Enrique is able to access the tube.

At the time of trial, Enrique received regular treatment in seven specialties: neurology, orthopedics, genetics, plastic surgery, otolaryngology, gastroenterology, and nutrition. The neurologists were investigating what caused Enrique to hold his breath for prolonged periods. The plastic surgeon monitored a hemangioma on his head. Enrique saw an otolaryngologist for laryngomalacia. The gastroenterologist monitored Enrique's feeding tube and G-button, and the nutritionist monitored his weight and adjusted his feedings if necessary. Molly took Enrique to all his medical

6

appointments. A nurse usually accompanied them in case emergencies arose.

Enrique experienced some developmental delays but was catching up on his milestones. Though he did not crawl until he was 11 months old, he was walking independently at the time of trial. He could say around 10 words and communicate well through sign language.

Leslie Hagemeier, a Department supervisor, and Molly both testified Enrique is thriving in Molly's home. Photos of Enrique at various ages show him smiling and playing.

### 2. Mother

#### a. Intellectual disability

*Psychological evaluation.* Psychologist Frank Fee, Ph.D., evaluated Mother's "current intellectual abilities, emotional functioning, and parenting skills." The evaluation included interviews of Mother and Grandmother and administration of several tests designed to assess Mother's intellectual and emotional functioning.

Mother scored 52 on the Wechsler Abbreviated Scale of Intelligence, placing her within the extremely low range of intelligence. She scored lower than the first percentile on two other tests: the Verbal Comprehension Index, which measures acquired knowledge, verbal reasoning, and attention to verbal information; and the Perceptual Reasoning Index, which measures fluid reasoning, spatial processing, attentiveness to detail, and visual motor integration. Her score of 16 out of 30 on the Mini-Mental Status Examination indicates severe cognitive impairment. Fee calculated Mother's reading level to be that of a second grader. Taken together, these results suggest Mother is generally incapable of reading and understanding most of the materials associated with this case. Due to her low reading level and cognitive impairment, Mother could not complete the two tests that measure emotional

functioning. Fee attempted to administer the tests orally, but Mother did not understand many of the words.

Fee asked Mother specific questions designed to elicit information about her parenting style and parent-child attachment. Her answers were too vague to provide meaningful information. For example, when asked what she thinks the most important responsibilities of a parent are, Mother replied, "They should take care of you like they are supposed to." She could not elaborate with any details. Similarly, when Fee asked her what would be the best thing she would do as a parent, she answered, "Take care of them." Mother reportedly did not know how to change a diaper but said Grandmother would do it.

Based on his evaluation of Mother, Fee concluded in part:

> As a parent, [Mother] does not appear [to] have even a basic understanding of parenting strategies. Furthermore, she appears to lack the capacity to develop such knowledge/skills. Given her developmental history and extremely low intellectual capacity, she will never be able to effectively parent a child.

> . . . .

> [Mother] does not have the intellectual capacity to function as a parent, and that status is not likely to improve given her lifelong intellectual disability.

***Other evidence about Mother's intellectual disability.*** Grandmother believed Mother's intellectual disability is related to the seizures Mother suffered frequently from infancy until age 17. According to Grandmother, Mother is too trusting and needs constant supervision. Mother's brother and sister both described Mother as innocent and childlike. All three agreed Mother cannot care for Enrique by herself.

### b.    Service plan

The Department created a service plan for Mother. The plan set goals for

Mother to: (1) address her own mental health needs; (2) demonstrate an ability to put Enrique's needs ahead of her own; (3) provide basic necessities such as food, clothing, shelter, and medical care for Enrique; (4) actively cooperate to fulfill the requirements of her service plan; and (5) assist in the identification of Enrique's father. So Mother could accomplish those goals, the plan required her to, among other things:

1.  identify any possible father of Enrique;

2.  apply for mental health services;

3.  initiate and participate in a psychiatric evaluation, a psychological evaluation, and individual therapy, and follow all recommendations;

4.  initiate and complete individualized parenting education;

5.  provide clothing and basic necessities for Enrique throughout the case;

6.  visit Enrique according to a schedule;

7.  maintain a safe and stable home and provide the caseworker with a copy of the lease agreement or ownership documents; and

8.  attend all court hearings and permanency team meetings about Enrique.

Hagemeier testified Mother received services from the Gulf Coast Center, a public agency that offers services for individuals with intellectual disabilities. She said Mother participated in a psychological evaluation but did not follow the evaluator's recommendations, and she began but did not complete individual therapy. According to Hagemeier, Mother visited Enrique "erratically" for the first several months he was in Department custody. Mother reportedly did not complete the other requirements of her service plan.

### c.    Relationship with Enrique

It was undisputed that Mother loves Enrique. Molly testified about Mother's

interaction with Enrique at visits:

> She's typically excited to see him. She loves him. But after maybe about the first 15 minutes, she kind of passes him back. She never really goes up to get him. We give him to her.

> And then if he needs anything or if he cries or needs [a] diaper change or feeding, he'll get passed back to the nurse or [me].

Molly never saw Mother change Enrique's diaper or feed him. Rather than learning from Molly how to handle Enrique's feeding tube, Mother, according to Molly, "chose not to do that and went to the restroom for a half hour; and a CPS worker that was there had to go find her." When Molly showed Mother photos of Enrique, Mother was at times "somewhat interested" and at times uninterested.

As he matured, Molly said, Enrique preferred to be around familiar people during his visits with Mother:

> [S]ince about when he was one, he's gotten a little more—he wants to be around people that are familiar. So, even though he's active, he keeps running back to the nurse or [me], who's in the room. He doesn't really, I guess, want to interact that much.

### d.    Criminal history

In November 2015, a grand jury indicted Mother on eight counts of indecency with a child as a criminal episode. The indicted offenses reportedly occurred on several occasions in 2014 and 2015. Six counts alleged Mother intentionally or knowingly, and with the intent to arouse or gratify her sexual desire, exposed her genitals to one or more teenaged boys. The remaining two counts charged her with touching the genitals of one of those boys. The indictment was later dismissed.

During her pregnancy, Mother spent more than six months in jail awaiting trial for an October 2014 injury to a child, a third-degree felony. She pleaded guilty to that offense in May 2016, about five weeks before Enrique was born. The trial

court signed an order of deferred adjudication and placed Mother on community supervision for four years.

### 3. Possible placements for Enrique

Enrique has lived with Molly, her husband, and their two sons for all but the first month of his life. The record does not reflect whether Molly and her husband plan to adopt Enrique.

Every witness who was asked agreed Mother cannot care for Enrique by herself. Grandmother acknowledged she cannot take care of Enrique, either. Hagemeier said the Department would be happy to place Enrique with a relative if that person is trained to handle Enrique's special needs. She believes it is in Enrique's best interest for the court to terminate Mother's parental rights but keep him with his family if possible. She testified she would continue to consider family members as placements even if Mother's parental rights were terminated. Two relatives testified they were willing and able to care for Enrique: his maternal uncle and his maternal aunt.

*Uncle.* Uncle is a father of 11 and a retired military combat medical specialist. He did not know Mother was pregnant until after Enrique was born. The Department conducted a home study on Uncle and approved him as a placement in the fall of 2016. However, for reasons not apparent from the record, Enrique was not placed with Uncle.

Uncle typically drove Mother for her scheduled visits with Enrique. At one visit, Molly began to teach him and Mother how to handle Enrique's feeding tube. Uncle joined Molly for roughly two of the 12 hours Enrique was in the hospital for a laryngoscopy. Molly testified about Uncle's demeanor at the hospital:

Q.     You did mention earlier that . . . [Enrique] was . . . undergoing a procedure, and the uncle was there for two hours and you were there for the whole time; is that correct?

A.     Uh-huh; yes.

Q.     . . . . [W]hy did you feel it was necessary to make that statement?

A.     I guess just to say he checked in but wasn't—I asked if he could stay the whole time to kind of be a supporter for him, for [Enrique].

Q.     And you didn't know . . . whether or not he had an appointment or anything.

A.     Oh, I knew. He tells me everything, or he likes to talk about what he does, so.

. . .

Q.     Well, when he was there, did he seem concerned about [Enrique]?

A.     No. He was telling me about the barbecue he had to go to after.

In September 2017, Uncle withdrew himself as a possible placement for Enrique because his wife had recently been diagnosed with cancer. At trial, Uncle renewed his offer to take care of Enrique but admitted he had not communicated his renewed offer to the Department. He said he knows "some" of Enrique's medical conditions.

*Aunt.* At the time of trial, Aunt worked the overnight shift as a cashier at a gas station. She previously worked as a security guard for 15 years. She has no children. She unequivocally expressed her willingness and desire to care for Enrique. Aunt testified she was willing to do "everything," including being trained to handle Enrique's special needs. The Department was conducting a home study on her at the time of trial.

Aunt did not know much about Enrique before trial. She did not know Mother

12

was pregnant, and she did not learn of Enrique's existence until he was several months old. Though she knew he had special medical needs, she did not know Enrique cannot attend daycare. Aunt said her friends and family would help her take care of Enrique.

### 4. Verdict and judgment

Question 1A of the jury charge asked whether Mother's parental rights should be terminated. The jury was instructed Mother's rights could be terminated only if it found by clear and convincing evidence that (1) termination would be in Enrique's best interest and (2) at least one of five stated grounds were true. The stated grounds tracked section 161.001(b)(1)(D), (E), (L), and (O) and section 161.003 of the Texas Family Code:

1. **161.001(b)(1)(E)**: [Mother] engaged in conduct or knowingly placed the child with the persons who engaged in conduct which endangers the physical or emotional well-being of the child; and/or

2. **161.001(b)(1)(D)**: [Mother] knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; and/or

3. **161.001(b)(1)(L)**: [Mother] has been convicted or has been placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under the following sections of the Penal Code . . . : . . . Section 22.04 (injury to a child, elderly individual, or disabled individual); and/or

4. **161.001(b)(1)(O)**: [Mother] failed to comply with the provisions of a court order that specifically established the action necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse and neglect of the child; and/or

5. **161.003**: [Mother] has a mental or emotional illness or a mental

13

deficiency that renders her unable to provide for the physical, emotional, and mental needs of the child, and the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child, and the [Department] has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on termination, and the [Department] has made reasonable efforts to return the child to the parent.

The jury unanimously found Mother's parental rights should be terminated.[2]

The trial court incorporated the jury's findings into its judgment of termination. The trial court also appointed the Department to be Enrique's managing conservator. Mother timely appealed.

### ANALYSIS

Mother raises two issues on appeal. First, she contends the evidence is factually and legally insufficient to support a finding that terminating her parental rights is in Enrique's best interest. Second, she contends the trial court abused its discretion in naming the Department as Enrique's managing conservator.

### I.      Termination

#### A.      Burden of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

The Department bears the burden to prove the facts supporting termination by

---

[2] The jury also found the parental rights of the unknown father should be terminated.

14

clear and convincing evidence. "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014).

The heightened burden of proof results in heightened standards of review for evidentiary sufficiency:

- *Legal sufficiency.* We consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

- *Factual sufficiency.* We consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *C.H.*, 89 S.W.3d at 25.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## B.    Inability to care for the child

The jury was presented with five statutory bases for termination of Mother's parental rights. The first four are subsections of section 161.001(b)(1) of the Family Code; the fifth is section 161.003. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Only one statutory finding, along with the best-interest determination, is necessary to support termination. We conclude the evidence is legally and factually sufficient to support the finding on section 161.003. Accordingly, we do not review the findings regarding section 161.001(b)(1). *See id.*

### 1. Legal standards

Parental rights may be terminated if the Department proves, by clear and convincing evidence, the parent is unable to care for the child. Specifically, the Department must prove:

1. the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;

2. the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;

3. the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination held in accordance with Subsection (c);

4. the department has made reasonable efforts to return the child to the parent; and

5. the termination is in the best interest of the child.

Tex. Fam. Code Ann. § 161.003(a) (West Supp. 2017). The hearing on termination may not be held earlier than 180 days after suit is filed. *Id.* § 161.003(c).

### 2. Application

**161.003(a)(1): mental deficiency that renders Mother unable to provide for Enrique's needs.** A mental illness or deficiency of a parent is not, in and of itself, grounds for termination of the parent-child relationship. *In re B.J.C.*, 495 S.W.3d 29, 36 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *Liu v. Dep't of*

*Family & Protective Servs.*, 273 S.W.3d 785, 791 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Evidence must support a determination that a parent's mental illness or deficiency prevents her from providing for her children now and in the future. *See B.J.C.*, 495 S.W.3d at 36; *In re A.L.M.*, 300 S.W.3d 914, 928–29 (Tex. App.—Texarkana 2009, no pet.).

With an IQ of 52, Mother has extremely low intelligence. She scored very low on tests measuring her verbal comprehension and perceptual reasoning. A mental status examination revealed severe cognitive impairment. She reads at a second-grade level. Mother was unable to complete some psychological tests because she could not read them and did not understand the questions when Dr. Fee attempted to administer the tests orally.

Mother could not provide anything more than broad, vague statements about her role as a parent. When asked what responsibility a parent has to her child, she could say only, "They should take care of you like they are supposed to."

Based on his evaluation, Dr. Fee concluded Mother does not appear to have "even a basic understanding of parenting strategies" and she appears to "lack the capacity to develop such knowledge/skills." As a result of "her developmental history and extremely low intellectual capacity," he wrote, "she will never be able to effectively parent a child." Dr. Fee's conclusions are clear and convincing evidence that Mother has a mental deficiency that renders her unable to provide for Enrique's physical, emotional, and mental needs. *See B.J.C.*, 495 S.W.3d at 37–38 (holding similar evidence of extremely low cognitive and reasoning abilities was sufficient to satisfy section 161.003(a)(1)).

**161.003(a)(2): deficiency will likely continue until Enrique turns 18.** "Section 161.003 does not require scientific certainty that [a parent's] mental illness [or deficiency] will continue until the children are eighteen; it only requires

reasonable probability." *Salas v. Tex. Dep't of Protective & Regulatory Servs.*, 71 S.W.3d 783, 791 (Tex. App.—El Paso 2002, no pet.). Dr. Fee opined Mother does not have the intellectual capacity to function as a parent and is not likely to improve given her lifelong intellectual disability. His opinion is clear and convincing evidence that Mother's mental deficiency probably will continue to render her unable to meet Enrique's needs until his 18th birthday. *See B.J.C.*, 495 S.W.3d at 38 (recognizing psychologist's testimony that parent's intellectual disability was "permanent and incapable of treatment" was among evidence satisfying section 161.003(a)(2)).

**161.003(a)(3): Department was managing conservator for six months before trial.** A trial on termination must not have been held earlier than 180 days after suit was filed, and the Department must have been Enrique's managing conservator for at least six months before trial began. *See* Tex. Fam. Code Ann. § 161.003(a)(3), (c).

Those requirements are satisfied in this case. The Department filed suit on July 26, 2016. The trial court appointed the Department to be Enrique's temporary managing conservator the same day. The court signed orders on August 9, 2016, and September 2, 2016, continuing the appointment. Trial on the petition for termination began on January 16, 2018.

**161.003(a)(4): Department made reasonable efforts to return Enrique to Mother.** Implementation of a family service plan by the Department is generally considered a reasonable effort to return a child to the parent. *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.). A family service plan is designed to reunify a parent with a child who has been removed by the Department. *Liu*, 273 S.W.3d at 795.

The Department created a service plan for Mother. The service plan alone is

considered a reasonable effort to return Enrique to Mother. *A.L.H.*, 468 S.W.3d at 744. Further, Hagemeier testified the Department's original goal was to reunify Enrique and Mother.

**161.003(a)(5): Termination is in Enrique's best interest.** Texas courts presume two conditions to be in a child's best interest: (1) prompt, permanent placement in a safe environment, Tex. Fam. Code Ann. § 263.307(a) (West 2014 & Supp. 2017); and (2) remaining with the child's natural parent. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

Courts may consider these non-exclusive factors, known as the *Holley* factors, in a best-interest analysis: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also identifies factors the court may consider in evaluating a parent's willingness and ability to provide the child with a safe environment. Tex. Fam. Code Ann. § 263.307(b). Finally, evidence supporting the statutory predicate of termination is relevant to the best-interest analysis. *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

***Enrique's needs and desires.*** Enrique has significant medical needs due to

his feeding tube. He is treated by specialists in seven medical fields. He requires constant care. The complexity of managing his health and safety prevents him from attending daycare.

Enrique is thriving in his foster home, the only home he has known. When a child is too young to express his desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

***Mother's parental abilities.*** As discussed above, the evidence shows Mother is incapable of taking care of a child—particularly Enrique, who has special medical needs. "The needier the child, the more able the parent must be." *A.L.M.*, 300 S.W.3d at 919. Mother does not know how to handle Enrique's feeding tube. When Molly attempted to teach her, Mother left the room for 30 minutes until a Department employee brought her back. Mother does not know how to change a diaper; she relied on Molly or another adult to change Enrique's diaper.

***Resources available to assist Mother.*** Hagemeier testified Mother received services from an agency that assists adults with intellectual disabilities. The record does not reflect whether those services included parenting education. Such education was a requirement of Mother's service plan, but she did not complete it. Grandmother testified she takes care of Mother, but also testified neither she nor Mother can care for Enrique.

***Proposed placement.*** Molly's home and home life appear stable. However, the record is silent as to whether or for how long Enrique will stay in his foster home following termination of Mother's parental rights. No evidence suggests the Department plans to move him. Aunt also appears to be a stable placement. Unlike

Molly, she does not know how to manage Enrique's feeding tube, but she said she would learn.

The lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor in the best-interest analysis. Otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located. *C.H.*, 89 S.W.3d at 28. "Instead, the inquiry is whether, on the entire record, a fact finder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest—even if the agency is unable to identify with precision the child's future home environment." *Id.*

***Acts or omissions and any excuses for them.*** Mother was indicted for eight counts of indecency with a child, most of which charged her with exposing her genitals to teenaged boys. The indictment was dismissed, though the record does not reflect the reason for the dismissal. Further, Aunt testified the offense was "the other way around," meaning the boys sexually assaulted and/or acted indecently with Mother. Though she is an adult, Mother's diminished intellectual capacity supports an inference that she lacked the ability to consent to sexual activity. *See* Tex. Penal Code Ann. § 22.011(b)(4) (West 2011 & Supp. 2017) (an actor's sexual conduct with a person is without consent if the actor knows that "as a result of mental disease or defect the other person is at the time of the sexual assault incapable either of appraising the nature of the act or of resisting it").

In 2016, Mother pleaded guilty to injuring a child in 2014. No further evidence about the offense was offered into evidence.

### 3.   Mother's argument

Though Mother makes a blanket assertion of insufficient evidence to support termination under section 161.003, she does not challenge the sufficiency of the

evidence to support any element of that section. Rather, she appears to contend section 161.003 is not a proper basis for termination because she does not seek to be Enrique's primary caregiver:

> . . . . [Mother] has plead [by her counter petition regarding conservatorship] to limit her own contact with [Enrique] and made a conscious decision to allow him to be raised primarily by [Aunt]. All the evidence the Department presented as it relates to this ground assumed [Mother] would be primarily caring for [Enrique].

Mother cites no authority for her contention that section 161.003 applies only if the parent seeks to be the child's primary caregiver. By its plain language, section 161.003 applies to "a parent" without limitation. "[C]ourts should not insert words into a statute except to give effect to clear legislative intent." *In re S.N.*, 287 S.W.3d 183, 188 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Laidlaw Waste Sys., Inc. v. City of Wilmer*, 904 S.W.2d 656, 659 (Tex. 1995)). We decline to infer Mother's suggested limitation because there is no indication the Legislature meant to restrict application of section 161.003 to a parent seeking managing conservatorship or other role as primary caregiver.

## C.     Conclusion on termination

The evidence supports findings that: (1) Mother has a mental deficiency that prevents her from meeting Enrique's physical, emotional, and mental needs; (2) the deficiency will probably continue to render her unable to meet Enrique's needs until his 18th birthday; (3) the Department was Enrique's managing conservator for at least six months before the termination hearing; (4) the Department made reasonable efforts to return Enrique to Mother; and (5) termination is in Enrique's best interest. Considering all the evidence in the light most favorable to those findings, we conclude the jury reasonably could have formed a firm belief or conviction that termination is warranted under Family Code section 161.003. Further, in light of the

entire record, we conclude the disputed evidence the jury could not reasonably have credited in favor of its findings is not so significant that the jury could not reasonably have formed a firm belief or conviction that termination is warranted under section 161.003. Accordingly, the evidence is legally and factually sufficient to support termination. We overrule Mother's first issue.

## II. Managing conservatorship

In her second issue, Mother contends the trial court abused its discretion in appointing the Department, rather than Aunt, to be Enrique's managing conservator. We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion and reverse only if we determine the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

A parent shall be named a child's managing conservator unless, as relevant here, the court finds that such appointment would significantly impair the child's physical health or emotional development. *See* Tex. Fam. Code § 153.131(a) (West 2014). The trial court made this finding, and it also found appointing the Department as managing conservator was in Enrique's best interest.

When the parents' rights are terminated, as here, section 161.207 of the Family Code controls the appointment of a managing conservator. *See In re I.L.G.*, 531 S.W.3d 346, 356–57 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Section 161.207 states:

> If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child.

Tex. Fam. Code § 161.207(a) (West 2014 & Supp. 2017). The appointment may be considered a "consequence of the termination." *L.G.R.*, 498 S.W.3d at 207.

Because the trial court terminated both parents' rights, its conservatorship decision in this case was governed by section 161.207, not section 153.131. *See I.L.G.*, 531 S.W.3d at 357; *L.G.R.*, 498 S.W.3d at 207. Accordingly, the trial court was required to appoint the Department or another permissible adult or agency as Enrique's managing conservator. Tex. Fam. Code Ann. § 161.207.

Mother offers no argument regarding how the trial court abused its discretion in naming the Department, rather than Aunt, to be Enrique's managing conservator. Instead, she "incorporates her argument as stated above as it relates to best interest and again reiterate [sic] that [Aunt] was willing to care for [Enrique] and supervise [Mother] at all times."

Mother's best-interest argument challenged evidentiary sufficiency. Our review of a conservatorship decision is for abuse of discretion, not sufficiency of the evidence. *J.A.J.*, 243 S.W.3d at 616 (termination finding is reviewed for legal and factual sufficiency, but conservatorship finding is reviewed for only abuse of discretion). We cannot say the trial court's decision to appoint the Department, an agency statutorily identified as an eligible managing conservator, was arbitrary or unreasonable. *See id.* We overrule Mother's second issue.

## CONCLUSION

We affirm the trial court's judgment.


/s/    J. Brett Busby
        Justice

Panel consists of Justices Busby, Brown, and Jewell.