

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00650-CV

**IN THE INTEREST OF L.J.C.**, a Child

From the 166th Judicial District Court, Bexar County, Texas
Trial Court No. 2023PA00691
Honorable Laura Salinas, Judge Presiding

Opinion by:      Rebeca C. Martinez, Chief Justice

Sitting:         Rebeca C. Martinez, Chief Justice
                 Lori I. Valenzuela, Justice
                 Velia J. Meza, Justice

Delivered and Filed: March 26, 2025

AFFIRMED

This is an accelerated appeal from an order terminating the parental rights of appellant, W.R.M. ("Mother"), to her child, L.J.C.[1]  In her first issue, Mother challenges the sufficiency of the evidence to support the jury's finding that termination of her parental rights is in L.J.C.'s best interest.  *See* TEX. FAM. CODE ANN. § 161.001(b)(2).  In her second issue, Mother contends that her trial counsel rendered ineffective assistance by failing to preserve her sufficiency challenge for appellate review.  We affirm.

---

[1] To protect the identities of L.J.C. and her half-siblings, we refer to all minors and adults as necessary by their initials or aliases.  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

## BACKGROUND

Mother's parental rights to her first three children were terminated in two prior proceedings. L.J.C., Mother's fourth child, was born on April 26, 2023. On May 9, 2023, the Texas Department of Family and Protective Services (the "Department") filed a petition to terminate Mother's parental rights to L.J.C. That same day, the trial court ordered the Department to be named as the child's temporary sole managing conservator. Two days later, L.J.C. was discharged from a neonatal intensive care unit at the hospital and placed into a foster home with her half-brother, D.S.R., who was two years old at the time. There, she resided through the time of trial.

From L.J.C.'s removal to nearly the eve of trial, sixteen months later, the Department's primary goal was reunification of L.J.C. with her Mother. In furtherance of that goal, in August 2024, Mother filed a motion for the monitored return of L.J.C. to her care. However, in September 2024, the Department's primary goal changed to termination of Mother's parental rights. On September 16 and 17, 2024, the trial court held an evidentiary hearing on Mother's motion for monitored return and, at the conclusion of the hearing, denied the motion.[2] The next day, a three-day jury trial commenced on the termination of Mother's parental rights. The trial court admitted over two dozen exhibits, and the jury heard from six witness: Leah Jarma, who was the Department's caseworker during the prior cases that resulted in the termination of Mother's parental rights to L.J.C.'s half-siblings; Ida Pierce, the Department's program director; Laura Irons, the Department's caseworker for L.J.C.'s case; the court appointed special advocate ("CASA"); L.J.C.'s foster father ("Foster Father"); and Mother.

---

[2] On September 17, 2024, the trial court also rendered an interlocutory order of termination as to L.J.C.'s unknown father, which was later incorporated into the final order of termination.

Mother did not move for an instructed verdict after the conclusion of the Department's case in chief or object to the submission of any issue to the jury. The jury found, by clear and convincing evidence, that Mother knowingly placed or knowingly allowed L.J.C. to remain in conditions or surroundings which endangered the child's physical and emotional well-being, *see id.* § 161.001(b)(1)(D); engaged in conduct or knowingly placed L.J.C. with persons who engaged in conduct which endangered the child's physical and emotional well-being, *see id.* § 161.001(b)(1)(E); had her parent-child relationship terminated with respect to another child based on an endangerment finding, *see id.* § 161.001(b)(1)(M); failed to comply with the provisions of a court order that specifically established the actions necessary for the return of L.J.C., *see id.* § 161.001(b)(1)(O); and had been the cause of L.J.C. being born addicted to a controlled substance, *see id.* § 161.001(b)(1)(R). Additionally, the jury found that termination of Mother's parental rights was in L.J.C.'s best interest. *See id.* § 161.001(b)(2).

The trial court rendered an order of termination conforming with the verdict on September 20, 2024, and signed a written order of termination on October 1, 2024. Mother did not file a motion for judgment notwithstanding the verdict, a motion to disregard the jury's answer to a vital fact issue, or a motion for new trial. She, however, timely appealed. Mother contends on appeal that the evidence was legally and factually insufficient to support the jury's finding that termination of Mother's parental rights was in L.J.C.'s best interest. She also argues that her trial counsel unjustifiably failed to preserve her sufficiency challenge for appellate review.

### PRESERVATION

For preservation of a legal sufficiency challenge following a jury trial, a party must have (1) moved for an instructed verdict, (2) moved for judgment notwithstanding the verdict, (3) objected to submission of the issue to the jury, (4) moved to disregard a jury's answer to a vital

fact issue, or (5) moved for a new trial. *In re D.T.*, 625 S.W.3d 62, 75 n.8 (Tex. 2021); *In re C.C.O.*, No. 04-24-00268-CV, 2024 WL 4897188, at *3 (Tex. App.—San Antonio Nov. 27, 2024, no pet.). For preservation of a factual sufficiency challenge following a jury trial, a party must have moved for new trial. TEX. R. CIV. P. 324(b)(2); *In re D.T.*, 625 S.W.3d at 75 n.8; *In re C.C.O.*, No. 04-24-00268-CV, 2024 WL 4897188, at *3. Mother took none of these actions.

Nevertheless, because termination proceedings implicate fundamental liberties, we sometimes may review unpreserved error. *See In re B.L.D.*, 113 S.W.3d 340, 351–55 (Tex. 2023); *In re M.S.*, 115 S.W.3d 534, 546, 550 (Tex. 2003); *In re C.C.O.*, No. 04-24-00268-CV, 2024 WL 4897188, at *3. As we recently summarized:

> We must apply our error-preservation rules, but we may deviate from them if a parent demonstrates that his or her counsel's failure to preserve a factual sufficiency complaint was unjustified, *see In re M.S.*, 115 S.W.3d at 549–50, and we potentially may deviate from our error-preservation rules if a parent demonstrates that his or her counsel's failure to preserve a legal sufficiency complaint was unjustified, *see In re J.P.B.*, 180 S.W.3d [570, 574 (Tex. 2005)]. Both of these exceptions incorporate the *Strickland* standard. *See In re M.S.*, 115 S.W.3d at 549; *In re J.P.B.*, 180 S.W.3d at 574.

*In re C.C.O.*, No. 04-24-00268-CV, 2024 WL 4897188, at *5. Under the two-prong *Strickland* test, to establish ineffective assistance of counsel, a party must show (1) that his or her counsel's performance was deficient and (2) that counsel's deficient performance prejudiced the party's defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *In re J.O.A.*, 283 S.W.3d 336, 341–42 (Tex. 2009). Thus, for a parent to show that his or her counsel unjustifiably failed to preserve error, such that we could dispose with our usual error-preservation requirements in a parental-termination appeal, a parent must show both counsel's deficient performance and prejudice under the *Strickland* standard.

As to the first *Strickland* prong, we afford great deference to counsel's performance and indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance." *In re M.S.*, 115 S.W.3d at 545. Moreover, ineffective assistance of counsel claims must be firmly founded in the record, and when the record is silent concerning the reasons for counsel's actions, we may not speculate to find counsel's representation ineffective. *See In re D.H.G.*, No. 04-21-00183-CV, 2021 WL 5088738, at *3 (Tex. App.—San Antonio Nov. 3, 2021, pet. denied); *In re L.C.W.*, 411 S.W.3d 116, 127 (Tex. App.—El Paso 2013, no pet.). When, as here, a motion for new trial is not filed in a case, "the rebuttable presumption is that it was considered by the appellant and rejected." *In re M.S.*, 115 S.W.3d at 549 (quoting *Smith v. State*, 17 S.W.3d 660, 662 (Tex. Crim. App. 2000)).

Mother has not directed us to any portion of the record that would rebut the presumption of counsel's reasonable professional assistance, including that a motion for new trial was considered by Mother and rejected. *See id.*; *see also In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) (holding "no evidence" point was not preserved where mother failed to address the preservation issue because "[i]t is reasonable to presume that her counsel's decision not to raise a 'no evidence' point was based either on litigation strategy or on her counsel's belief that, in his professional opinion, the evidence was legally sufficient and preservation of error was not warranted").

In most cases, this silence as to any reason for trial counsel's inaction would prevent a reviewing court from finding deficient performance. *See In re M.S.*, 115 S.W.3d at 549; *In re J.P.B.*, 180 S.W.3d at 574; *In re C.C.O.*, 2024 WL 4897188, at *6. Moreover, here, there is no indication in the record that trial counsel abandoned Mother after trial. *See In re J.O.A.*, 283 S.W.3d at 343 (holding presumption of reasonable professional assistance rebutted where deadline to file statement of points passed after trial counsel filed "his motion to withdraw and did nothing further," and appellate counsel was appointed later). Instead, the record shows that trial counsel filed a motion to withdraw on September 25, 2024, which was five days after trial ended, and that

the trial court granted the motion and appointed Mother new counsel the next day. On October 1, 2024, the trial court signed the order of termination.

On this record, the subject of our inquiry into deficient performance may, more appropriately, be Mother's appellate counsel. The deadline to file a motion for new trial is "prior to or within thirty days after the judgment or other order complained of is signed." TEX. R. CIV. P. 329b(a); *see In re D.H.G.*, 2021 WL 5088738, at *4 n.3 This thirty-day period after judgment is signed, "is generally referred to as 'the motion for new trial stage.'" *In re D.H.G.*, 2021 WL 5088738, at *4 (citing *Cooks v. State*, 240 S.W.3d 906, 909 (Tex. Crim. App. 2007); *In re I.L.*, 580 S.W.3d 227, 241 (Tex. App.—San Antonio 2019, pet. dism'd)). During this entire "critical" stage, Mother's appellate counsel represented her. *See In re J.O.A.*, 283 S.W.3d at 343; *Cooks*, 240 S.W.3d at 907. On appeal, appellate counsel offers no explanation for his failure to file a motion for new trial after his appointment, yet he complains about the failure to file as deficient performance. *See Cooks*, 240 S.W.3d at 911 (holding presumption of adequate representation was rebutted by representing from appellate counsel that she lacked time to adequately advise her client as to a motion for new trial when only ten days remained to file motion after her appointment).

Nevertheless, we do not resolve the first *Strickland* prong because Mother's failure to satisfy the second *Strickland* prong provides an independent and sufficient basis to affirm. *See Strickland*, 466 U.S. at 687; *In re C.C.O.*, 2024 WL 4897188, at *3. To establish prejudice under the second *Strickland* prong, Mother must show "there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different." *In re M.S.*, 115 S.W.3d at 550 (citation omitted). In considering prejudice based on a failure to preserve, we determine harm as if the issue "had been preserved." *See id.*; *see also In re I.L.*, 580 S.W.3d

at 246. If we conclude the complaint would have had merit, we "must hold that counsel's failure to preserve . . . constituted ineffective assistance of counsel." *In re M.S.*, 115 S.W.3d at 550.

For the reasons given in our analysis below, we hold that Mother has not shown prejudice based on a failure to preserve legal and factually sufficiency complaints as to the jury's best-interest finding because those complaints are meritless, even had they been preserved. Accordingly, without determining the first *Strickland* prong, we overrule Mother's second issue, concerning alleged ineffective assistance of counsel, based on Mother's failure to satisfy the second *Strickland* prong. *See id.*; *In re J.R.R.*, No. 04-22-00076-CV, 2022 WL 3047099, at *3 (Tex. App.—San Antonio Aug. 3, 2022, no pet.) (assuming counsel's deficient performance and overruling ineffective assistance of counsel issue based on failure to show prejudice). We also overrule Mother's first issue because, without satisfying the *Strickland* standard, she has not established an exception to allow for our review of unpreserved legal and factual sufficiency complaints. *See id.*; *In re C.C.O.*, 2024 WL 4897188, at *5. In any event, our analysis of prejudice under the second *Strickland* prong coincides with a merits analysis of the sufficiency complaints, and for the following reasons, Mother's sufficiency complaints are meritless. *See In re M.S.*, 115 S.W.3d at 550.

BEST INTEREST

Mother argues that the trial evidence is legally and factually insufficient to support the jury's finding that termination of her parental rights is in L.J.C.'s best interest.

**Standard of Review**

A parent-child relationship may be terminated, pursuant to section 161.001 of the Texas Family Code, only if the trial court finds by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and that termination is in a child's best interest. *See* TEX.

FAM. CODE ANN. § 161.001(b)(1), (2).  Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *Id.* § 101.007.

"This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal."  *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).  In reviewing a legal-sufficiency challenge:

> [A] court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.  To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so.  A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.  This does not mean that a court must disregard *all* evidence that does not support the finding.  Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.  If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*In re J.O.A.*, 283 S.W.3d at 344–45 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).  Only when the factual sufficiency of the evidence is challenged, is disputed or conflicting evidence under review.  *Id.* at 345.  "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."  *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

**Applicable Law**

There is a strong presumption that keeping a child with a parent is in a child's best interest.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).  However, it is equally presumed that

"the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). In determining whether a child's parent is willing and able to provide the child with a safe environment, we consider the factors set forth in Texas Family Code section 263.307(b). *See id.* § 263.307(b).

Our best-interest analysis is guided by consideration of the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *See id.*at 372; *accord In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013). The Department is not required to prove each factor, and the absence of evidence regarding some of the factors does not preclude the factfinder from reasonably forming a strong conviction that termination is in a child's best interest, particularly if the evidence is undisputed that the parent-child relationship endangered the safety of the child. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Our concern is whether the evidence, as a whole, is sufficient for the trial court to have formed a strong conviction or belief that termination of the parent-child relationship is in the best interest of the child. *Id.*

**Analysis**

*L.J.C.'s Desires*

"When assessing the desires of children too young to testify articulately, courts can consider their bond with their parents and prospective adoptive parents." *In re A.N.C.*, 679 S.W.3d 311, 327 (Tex. App.—San Antonio 2023, no pet.) (citation omitted). "The fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent." *Id.* (citation and brackets omitted). "Generally, when children are too young to express their desires, this factor is considered neutral." *In re M.A.J.*, 612 S.W.3d 398, 410 (Tex. App.—Houston [1st Dist.] 2020, pet. denied); *see also In re M.I.A.*, 594 S.W.3d 595, 602 (Tex. App.—San Antonio 2019, no pet.).

The first *Holley* factor is neutral or only slightly favors termination of Mother's parental rights. L.J.C. has resided with her foster parents since her discharge from the hospital following birth, and, since entering into foster care, L.J.C. has lived with her half-brother, D.S.R. D.S.R. has resided with his and L.J.C.'s foster parents since before L.J.C. was born, and, in August 2024, the foster parents adopted D.S.R. Foster Father testified that he and his wife also wish to adopt L.J.C. Jarma, the Department's caseworker for D.S.R.'s case, testified that L.J.C. and D.S.R. share a bond. Irons, the Department's caseworker for L.J.C.'s case, also testified to the children's bond. She further testified that L.J.C. is bonded with the foster parents, who maintain a safe and stable home and take L.J.C. to all medical appointments. Additionally, Irons testified that L.J.C. has a bond with Mother and calls both Mother and her foster mother "mama."

Mother has had limited contact with L.J.C. since her birth. Pierce, who is the Department's program director, Irons, and CASA testified that Mother was allowed supervised, weekly visits with L.J.C. that progressed from two to six hours in duration over the course of the case. According

to CASA, Mother consistently attended visits. Foster Father, however, testified that he counted fifteen or twenty missed visits by Mother. Resolution of this conflicting testimony was within the jury's province. *See In re J.F.C.*, 96 S.W.3d at 266; *see also In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (explaining reviewing court must defer to jury's determination on credibility issues, as long as those determinations are not unreasonable). In any event, however resolved, the testimony shows Mother has had limited and always supervised contact with L.J.C. since her birth.

<u>*L.J.C.'s Physical and Emotional Needs and Danger to L.J.C.*</u>

The evidence as to *Holley* factors two and three supports the jury's best-interest finding. Mother's first parental termination case began in August 2021, and resulted in termination of Mother's parental rights to her two oldest children. Mother's second case began in April 2022, and resulted in termination of Mother's parental rights to D.S.R on endangerment grounds. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E); *cf. In re J.M.G.*, 608 S.W.3d 51, 54–55 (Tex. App.—San Antonio 2020, pet. denied) (considering prior termination decree that included endangerment findings as evidence that termination of parental rights was in the best interest of another child). Jarma was the Department's caseworker for Mother's first two cases. She and Mother provided some details about these cases, which suggest that Mother has not resolved all physical and emotional dangers to children in her care.

All three of Mother's cases raise concerns about Mother's drug use. During Mother's first case, she admitted to methamphetamine and cocaine use. According to Jarma, Mother was "semi-compliant" with drug testing during that case. Mother's second case began upon allegations that Mother was using drugs in her apartment, and Mother admitted, at the beginning of that case, that she was using methamphetamine. As in the first case, Mother was "semi-compliant" with drug

testing. Just a month before L.J.C. was born in April 2023, Mother tested positive for methamphetamine. Mother admitted at trial that she used ecstasy once while pregnant with L.J.C., and she attributed the positive methamphetamine test result to Adderall use. However, according to Pierce, Mother never produced a prescription for Adderall, and Adderall would not cause a positive test result for methamphetamine. Irons testified that Mother admitted to her that she once used methamphetamine while pregnant with L.J.C. Mother's positive test result for methamphetamine shortly before L.J.C. was born led the Department to initiate this case.

L.J.C. was born with a cyst on her brain. According to Foster Father, L.J.C. suffered tremors in the neonatal intensive care unit in which she was placed for the first two weeks of her life. CASA testified that, when she first met L.J.C. at eight weeks old, L.J.C.'s joints were stiff. CASA, who is a retired nurse, attributed this stiffness to drug exposure. L.J.C. received occupational and physical therapies, and visited quarterly with a neurosurgeon for the first year of life. According to Foster Father, L.J.C.'s developmental milestones were delayed, and L.J.C. has gone to fifty medical appointments since birth. Mother was discharged from the hospital two days after she gave birth, and she testified that the testimony she heard from others about L.J.C.'s tremors and stiffness were "new" to her. At trial, Mother could not name the therapies L.J.C. needs or the specialist she sees.

Mother completed substance abuse treatment, as required by the Department, and she tested negative for any drug use over the course of the case. Nevertheless, Jarma noted a pattern of Mother being engaged with drug treatment and then relapsing. *Cf. In re J.O.A.*, 283 S.W.3d at 346 ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."). L.J.C. was born with medical needs requiring heightened monitoring and medical attention. With these needs, the

risk to L.J.C. from any potential relapse by Mother was great. *See In re A.C.P.T.*, No. 04-19-00824-CV, 2020 WL 2045280, at *2 (Tex. App.—San Antonio Apr. 29, 2020, no pet.) ("The needier the child, the more able the parent must be." (quoting *In re E.R.*, 555 S.W.3d 796, 809 (Tex. App.—Houston [14th Dist.] 2018, no pet.)); *see also* TEX. FAM. CODE ANN. § 263.307(b)(1) (providing that a child's age and physical and mental vulnerabilities are relevant considerations); *id.* § 263.307(b)(6) (providing that psychiatric, psychological, and developmental evaluations of a child are relevant).

In addition to drug abuse, Mother's cases also raised concerns about reoccurring domestic violence. Evidence of domestic violence in the home supports a best-interest finding. *See Holley*, 544 S.W.2d at 371–72; *In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.–Houston [14th Dist.] 2003, no pet.) (stating domestic violence, even when child is not the intended victim, supports finding that termination is in a child's best interest). Simply exposing a child to domestic violence is a relevant consideration. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(E) (courts may consider whether parent has adequate skills to protect child from repeated exposure to violence although violence may not be directed at the child); *In re O.N.H.*, 401 S.W.3d 681, 685 (Tex. App.–San Antonio 2013, no pet.).

Jarma testified that, until D.S.R.'s removal, Mother wanted to coparent with the father of her first three children, D.D.R. Fifteen police reports were admitted into evidence. In several, Mother complains that D.D.R. threatened to shoot her. One, from April 2022, describes an incident in which D.D.R. set fire to a shirt outside of Mother's home after threatening Mother with homelessness. Mother put the fire out. Another, from June 2022, includes a narrative stating that Mother threw glass bottles at someone she described as a former friend. That former friend then banged on Mother's door while holding a kitchen knife. A report from November 2022 states that

another former friend contacted police to report that Mother made threats to "beat" that person. A report from 2018 describes a sting operation that resulted in Mother's arrest for prostitution.

In addition, the jury heard testimony from which it could reasonably draw the conclusion that Mother was exposed to violence during L.J.C.'s case. Several witnesses discussed a "fake lease" Mother presented to the Department. Mother, herself, testified that she was not forthcoming with the Department until after her deception was discovered. Discovery of the "fake lease," shortly before trial, led the Department to pursue termination as its goal.

The undisputed testimony shows that, at or near the start of the case, Mother lived in an apartment with two roommates, who passed background tests required by the Department. Later, Mother moved into a different apartment with different roommates. Mother, however, provided the Department with a "fake lease" that showed that the second apartment was leased by one of Mother's first roommates. CASA testified that Mother told her that the roommates at the second apartment were the same as those at the first. Mother testified that her roommates at the second apartment gave her a "fake lease" because they did not want the Department to be involved in their lives.

The jury also heard testimony that suggested both sets of Mother's roommates engaged in domestic violence. CASA testified that she met one of Mother's roommates at the second apartment who stated that "he helped her move from the previous apartment due to domestic abuse." Mother, in contrast, testified that she moved for a better apartment. Additionally, CASA testified that the apartment manager at the second apartment told her that, a few weeks before Mother moved into the second apartment, one of Mother's roommates at the second apartment hit a neighbor's door with a baseball bat. Mother testified that she was aware of this incident and that her roommate later broke through the neighbor's rear, glass door and assaulted a resident; however,

Mother contended that she was not aware before she moved in. CASA and Pierce testified that Mother's second set of roommates allowed one of Mother's visits with L.J.C. to occur but later denied additional visits.

It was within the jury's province to resolve conflicting testimony and draw reasonable inferences. *See In re J.F.C.*, 96 S.W.3d at 266; *see also In re J.W.*, 645 S.W.3d 726, 745 (Tex. 2022). Mother's admission that she provided a "fake lease" to the Department could have reasonably led the jury to doubt Mother's testimony entirely and credit testimony and inferences that, at both apartments, Mother experienced domestic violence, which she wished to keep concealed from the Department. *See In re J.W.*, 645 S.W.3d 726, 745 (Tex. 2022) ("[T]he evidence that Father attempted to help Mother fake the results of a drug test (and his denial of the event) could reasonably have led the jury to doubt Father's entire testimony.").

*Parental Abilities of Those Seeking Custody of L.J.C.*

"Evidence of illegal drug use during pregnancy is relevant to a best interest analysis." *See In re M.R.P.*, No. 04-22-00312-CV, 2022 WL 6815173, at *5 (Tex. App.—San Antonio Oct. 12, 2022, pet. denied) (mem. op.). Mother's drug use late in her pregnancy with L.J.C. reflects poor judgment and a lack of parental abilities. *See In re A.E.R.*, No. 04-24-00109-CV, 2024 WL 3588391, at *5 (Tex. App.—San Antonio July 31, 2024, no pet.) (mem. op.) (substance abuse "strongly suggests" poor judgment and lack of parenting skills). Moreover, Mother was unable to articulate L.J.C.'s medical treatments at trial, and she was unaware of L.J.C.'s tremors and stiffness until hearing about these matters at trial. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(F) (courts may consider whether parent has adequate parenting skills including an understanding of the child's needs and capabilities). As just discussed, the testimony can be viewed to suggest that Mother lacks the willingness to remove herself from violent living arrangements. *See id.* §

263.307(b)(11) (providing as relevant factor willingness and ability of child's family to effect positive environmental and personal changes within a reasonable period of time).

Conversely, the foster parents had taken L.J.C. to fifty medical appointments before her second birthday. Additionally, according to Jarma, the foster parents were responsive to D.S.R.'s medical needs, and D.S.R. was happy and playful. *See id.* § 263.307(b)(12)(D) (courts may consider whether child's family demonstrates adequate parenting skills, including providing other children under the family's care with a safe physical home environment).

*Plans for L.J.C. and the Stability of the Home or Proposed Placement*

"Stability and permanence are paramount in the upbringing of children." *In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.) (citation omitted). L.J.C.'s foster parents wished to adopt her. According to Irons, during the pendency of the case, the foster parents provided L.J.C. with a safe and stable home. In contrast, there was a significant amount of evidence from which the jury could reasonably conclude that Mother had failed to maintain a safe or stable home before or during the case. At the time of trial, Mother testified that she was staying at a hotel for two weeks and, after that, she intended to find housing with the assistance of an agency that assists crime victims. Additionally, Mother testified that she was unsure whether she had been terminated from her job as a housekeeper at a hotel. Irons testified that she confirmed with Mother's employer that Mother was no longer employed. *See In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *8 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.) (considering parent's failure to maintain stable housing and employment as supportive of best-interest finding).

*L.J.C.'s Best Interest*

Considering all the evidence in the light most favorable to the jury's best-interest finding, we conclude that the jury could have formed a firm belief or conviction that termination of Mother's parental rights was in L.J.C.'s best interest. *See In re J.F.C.*, 96 S.W.3d at 266. We further conclude that any disputed evidence, viewed in light of the entire record, was not so significant that the jury could not reasonably have formed a firm belief or conviction that termination was in L.J.C.'s best interest. *See id.* Therefore, we hold the evidence is legally and factually sufficient to support the jury's best-interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

## CONCLUSION

Mother's first issue, challenging the legal and factual sufficiency of the jury's best interest finding, is overruled because it was not preserved and, alternatively, because it is meritless. Mother's second issue, challenging trial counsel's allegedly ineffective assistance, is overruled, without a determination as to deficient performance, because Mother has not shown prejudice. The trial court's order of termination is affirmed.

Rebeca C. Martinez, Chief Justice