

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00297-CV

———————————————

IN THE INTEREST OF A.G., A CHILD

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. D2019261

Before Sudderth, C.J.; Birdwell and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

Appellant Mother,[1] who has been in the foster care system since she was three years old, has a full-scale IQ between 43 and 53[2] and suffers from disruptive mood dysregulation disorder, impulsivity, and violent outbursts. During one of the occasions when she ran away from a foster home, she engaged in sexual intercourse with a stranger,[3] resulting in pregnancy with her son A.G. Mother was 15 years old when A.G. was born in September 2019, and the Department of Family and Protective Services (DFPS) removed A.G. from Mother at the hospital three days

---

[1]We use an alias to refer to the parent and initials to refer to the subject child. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]"IQ" or "intelligence quotient" testing is "a significant factor in making both the legal and clinical assessment of intelligence or intellectual functioning" as to intellectual disability. Robert M. Sanger, *IQ, Intelligence Tests, "Ethnic Adjustments" and Atkins*, 65 Am. U.L. Rev. 87, 101 (2015) (discussing IQ in the death-penalty context). For comparative purposes, an IQ of 100 "is the average IQ score of youths nationwide, ranging mostly from 85 to 115." Thomas Grisso, Ph.D., *Adolescents' Decision Making: A Developmental Perspective on Constitutional Provisions in Delinquency Cases*, 32 New Eng. J. on Crim. & Civ. Confinement 3, 9 (2006).

[3]A.G.'s father was never identified, and his parental rights were terminated under Family Code Section 161.002(b)(2)(A). *See* Tex. Fam. Code Ann. § 161.002(b)(2)(A) (providing that an alleged father's rights may be terminated if the child is over one year old when the termination-of-parental-rights petition is filed, he has not registered with the paternity registry under Chapter 160, and after the exercise of due diligence by the petitioner, his identity and location are unknown).

after his birth. Mother was 17 years old at the time of the termination trial in September 2021.[4]

The trial court terminated Mother's parental rights to A.G. based on her failure to comply with court orders, *see* Tex. Fam. Code Ann. § 161.001(b)(1)(O), based on her mental or emotional illness or mental deficiency that rendered her unable to provide for A.G.'s physical, emotional, and mental needs, *see id.* § 161.003, and based on the child's best interest, *see id.* §§ 161.001(b)(2), .003. The trial court then appointed DFPS as A.G.'s managing conservator.

In four issues, Mother appeals, challenging the legal and factual sufficiency of the evidence to support the trial court's Section 161.001 and 161.003 findings and its decision to appoint DFPS as A.G.'s managing conservator. We affirm.

## II. Sufficiency of the Evidence to Support Termination

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. *Id.* § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it

---

[4]The case's deadline was extended under the supreme court's emergency orders issued in response to the Covid-19 pandemic. *See, e.g.*, *In re M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *1 & n.3 (Tex. App.—Fort Worth Oct. 21, 2021, pet. denied) (mem. op.) (explaining how trial court retained jurisdiction in termination-of-parental-rights case filed in 2019 and tried in 2021).

must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). For the same reason, we carefully scrutinize termination proceedings and strictly construe involuntary-termination statutes in the parent's favor. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 563; *Holick*, 685 S.W.2d at 20–21. Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802.

Accordingly, for a trial court to terminate a parent–child relationship under Section 161.001, DFPS must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). To terminate parental rights under Section 161.003, the trial court must find that:

> (1) the parent has a mental or emotional illness or a mental deficiency that renders [her] unable to provide for the physical, emotional, and mental needs of the child;

> (2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;

4

(3) [DFPS] has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination held in accordance with Subsection (c);

(4) [DFPS] has made reasonable efforts to return the child to the parent; and

(5) the termination is in the best interest of the child.

Tex. Fam. Code Ann. § 161.003(a)(1)–(5). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *E.N.C.*, 384 S.W.3d at 802.

## A. Standards of Review

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that DFPS proved the specific grounds at issue here—subsection (O) of Section 161.001 or Section 161.003—and that the termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. §§ 161.001(b)(1)(O), (2), .003; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## B. Evidence

Eight witnesses testified at trial: Kim Lilly, one of Mother's former teachers; Spencer Kirk, Mother's DFPS case manager for five years; Neneh Bah, manager of the group home where Mother lived at the time of the trial; Alyssa Bottlinger, A.G.'s caseworker; Margaret Ray, Bottlinger's supervisor; Julia Bishop, Mother's caseworker since February 2021; Kathy Childress, A.G.'s Court Appointed Special Advocate (CASA) volunteer; and Holly Stewart, Mother's CASA volunteer. The trial court also admitted into evidence Mother's November 19, 2020 psychological evaluation and

photographic evidence of injuries and property damage Mother had caused during episodes when she could not control her emotions.

### 1. Kim Lilly's Testimony

Lilly, who had been teaching reading and social skills to intellectually disabled students in the Hurst-Euless-Bedford Independent School District for a decade, testified that Mother had been in her class for six months during the preceding year.[5] To be placed in Lilly's class, a student must have an overall IQ of 70 or less. Lilly questioned whether, based on Mother's reading tests, Mother's IQ was actually below 70, but she agreed that even if Mother had tested higher in reading, this would not necessarily indicate Mother's overall IQ score, including "adaptive IQ, which is how they function at home and at school, so there's a lot that goes into that." Lilly opined that socially, Mother was "much higher functioning than the children that [Lilly] normally work[ed] with." However, Mother did not make progress in her behavior or maturity level while in Lilly's class. For example, Lilly said that Mother "would write about having sex" and would draw "inappropriate things," like the male sexual organ.

Lilly also reported that there had been problems with Mother's aggression—both verbal and physical—toward other students. Lilly stated that Mother had been transferred to her school from a different junior high after assaulting a student. Two of the district's behavior employees had accompanied Mother to Lilly's school, had

---

[5]Although Lilly had taught both on-line and in-person classes because of Covid-19, Mother had attended classes in-person.

worked with Mother one-on-one on appropriate behavior and responses, and had "provided [Mother] with a lot of support." But one of the behavior employees had retired, and the other had been needed elsewhere in the district. After that, Mother had to be escorted from class to class, and "[s]omeone was with her at all times."

Lilly recounted an occasion when a student with whom Mother had previously been friendly said something to Mother that caused Mother to jump on a table, grab the hair on the back of the other student's head, and punch the student in the face. It did not appear to Lilly that Mother had acted in self-defense or that Mother's actions were otherwise warranted. An intervention was required to stop Mother's assault on the other student, and Mother was suspended for three school days.[6]

Lilly had been injured by Mother and had seen Mother injure another teacher. After Mother's three-day suspension arising from the assault on the student, Mother was placed in a different classroom. Lilly said that being placed in a different classroom had enraged Mother, and she described Mother's reaction as follows,

> [Mother] began to clear the room. She threw a computer, broke it. She flipped a table and broke the legs off of it. We had four teachers [and] . . . a behavior coordinator in the room, and we were removing objects as fast as we could. We had already cleared out a -- a bunch of things because we thought -- just in case she was to get upset. She, you know, was kicking the walls. She picked up a microwave to throw at us. She was very, very upset.

---

[6]According to Lilly, Mother was very impulsive and had difficulty controlling her emotions. Lilly attributed this to Mother's failure to "think about what's going to happen next." Instead, Mother, "acts on how she feels in the moment."

8

During the incident, Mother ripped some of Lilly's hair out as Lilly tried to free another teacher from Mother's grasp. Eventually, the school's campus police officer had to use restraints to calm Mother

Mother had also talked about or threatened suicide during the time she attended Lilly's school. When confronted about it, however, Mother claimed it was a joke.

Additionally, during the five to six months that Mother had attended the school, she ran away from campus "close to ten" times, each time requiring pursuit. Lilly stated, "[T]here were many times that she tried to leave campus and we had to call our campus police officer to help us." And each time Mother tried to run away, she would be reminded that she could not leave campus.

Lilly expressed concern about Mother's ability to be a parent to A.G., testifying that

> [p]arenting is hard. I'm a parent myself, and there are times when my kids were young and screaming mommy, mommy, mommy, mommy, over and over again, that I wanted to go hide. And I'm neurotypical[7] . . . and I have impulse control. My fear is -- not my fear. My concern is that in a moment of hard parenting that she would not be able to control her impulse or anger toward him.

---

[7]"Neurotypical people are those individuals who do not have a diagnosis of autism or any other intellectual or developmental differen[ce]." Heidi E. Ramos-Zimmerman, *The Need to Revisit Legal Education in an Era of Increased Diagnoses of Attention-Deficit/hyperactivity and Autism Spectrum Disorders*, 123 Dick. L. Rev. 113, 116 n.19 (2018) (quoting Lisa Jo Rudy, *What Does It Mean To Be Neurotypical?*, VERYWELLHEALTH (June 22, 2018), http://bit.ly/2QzqisA).

During cross-examination, Lilly agreed that she had never met A.G., was not aware if Mother had ever had visitation with A.G., had never seen Mother's parenting skills, and had not taught any parenting skills to Mother during her time as Mother's educator.

Finally, Lilly reported that Mother was troubled by her history with CPS and her family:

> She told me about her son. She told me about her parents. She told me that she had been in a lot of different homes. She told me that -- that her son was taken away from her and [that] she wanted him back. She would tell me a lot of things that -- it was kind of like a counseling session all the time. She was . . . deeply hurt by . . . [a]ll that has transpired in her life, and it seemed like it helped when she could talk about it.
>
> . . . .
>
> She told me that they were trying to find out who her dad was. She was very upset one time that she was told they couldn't find her dad but that they knew who her mom was. She would always tell me that -- we talked about whether they were bad people or whether they just made bad decisions that ended up . . . with her removal from their care. She told me about her brother. She was always really excited to get to talk to him.

### 2. Spencer Kirk's Testimony

Kirk, Mother's former CPS caseworker, testified that he had been her caseworker for approximately five years—"[s]ince she returned back to care in 2015." Mother's parents' rights to her had been terminated, and she was placed in a foster home with her brother. While Mother and her brother were adopted, they were ultimately returned to DFPS.

Kirk testified that Mother had been removed from her biological parents on an allegation of physical abuse in 2000, but almost ten years transpired before her parents' rights were terminated. During four of those years, Mother and her brother were in a foster home together. In 2010, they were adopted by their foster mother, but in 2015, they were returned to the foster system. Kirk stated:

> Her adoptive mother basically refused to accept parental responsibility of her. She -- the adoptive mother brought her into our office along with her brother and basically dropped her . . . off and said, I can no longer care for her due to her behaviors and her brother's behaviors.

At that time, DFPS took permanent managing conservatorship of Mother. After that, DFPS had been unable to find anyone willing to care for Mother.

When Mother was not in a foster home, she was in a residential treatment facility or a psychiatric hospital. During the five years that Kirk had been her caseworker, and at the time A.G. was removed from Mother, Mother had completed "[a]pproximately 30" psychiatric hospital stays based on aggressive behavior and suicidal ideation. It was difficult to maintain Mother in a foster home because she would cycle through two weeks of appropriate behavior and obeying rules (the "honeymoon period" with a new foster home) and then run away when "faced with a rule or told no." Once Mother realized that she received attention that way, it became a recurring event. Mother would run away and then return to the home before taking off again, "sometimes it was just one after the other." Kirk said that he recalled a one-month period when Mother ran away 22 times, although some of those instances

11

just involved leaving campus or the foster home without permission and returning 30 minutes later. Kirk said that most of the time, Mother just ran away for an hour or so, because "[s]he didn't really have anywhere to run to," but he recalled one instance when she was "gone for a while, at least a couple of days," possibly a week.

Kirk recalled that Mother had attempted suicide at least on one occasion. Specifically, he recounted one occasion when Mother had tried to jump from her school's two-story balcony and was tackled by the principal to stop her from going over the edge. Mother had made statements about suicide while pregnant, but Kirk did not recall any physical suicide attempts during her pregnancy. And while some of Mother's suicidal threats were serious, Kirk also observed that Mother had learned that if she wanted to get out of the foster home, she could make suicidal statements and go to the psychiatric hospital. Mother also ran away while pregnant but never went far.

Mother had been placed in four separate therapeutic foster homes,[8] but each time, the placement broke down. In 2015, Mother was arrested for assaulting her foster mother, but those charges were dropped. Mother had been on runaway status from one of the therapeutic foster homes when she became pregnant with A.G. According to Kirk, Mother had run away to a shopping mall two blocks from her

---

[8]A therapeutic foster home is a foster home in which the foster parents are trained to handle more aggressive behaviors, to de-escalate certain situations, and to provide appropriate medication management.

foster home, had gotten into a vehicle with two men, and had been intimate in the vehicle's back seat with at least one of them. Within 24 hours, the police found Mother at a train station, and she was returned to the foster home. Mother did not know either of the men in the vehicle. She identified one as "Dan," but she gave no last name for him or any other identifying information. Mother told Kirk that Dan was her boyfriend, that they were going to go away and raise the baby together, and that he was going to take care of her. Kirk believed that in Mother's mind, she knew the men, but he opined that Mother knew neither man. Mother claimed that she had called Dan since then, but Kirk had no way to verify that.

Kirk said that although Mother's IQ was evaluated annually, he had never seen any substantial change in her scores. A 2018 psychological evaluation rated Mother's full-scale IQ at 43, a score Kirk testified was consistent with her past IQ scores.[9] According to the evaluation, Mother suffers from an intellectual disability and disruptive mood dysregulation disorder and is a suspected victim of child neglect. Kirk read aloud from the psychological evaluation summarizing the challenges that Mother would face as a parent:

---

[9]The trial court admitted without objection Petitioner's Exhibit 1, Mother's November 19, 2020 psychological evaluation. And at this point in the proceedings, the trial court granted a recess. Mother's counsel reported that Mother had chosen to step out during Kirk's testimony. The trial court noted for the record that "she's had some difficulty remaining quiet during all of the testimony." The 2020 report reflected an IQ composite score of 53 but stated that Mother's 2018 report had shown a full-scale IQ of 43.

13

> With regard to parenting, [Mother] presents with many challenges that do not bode well for successful parenting. Factors that contribute to successful parenting for individuals with intellectual disabilities at the moderate level include living with an adult who can provide daily support, adequate motivation and willingness to accept support, ability to nurture, significant in-home training, appropriate models for parenting, good physical and mental health, adequate finances, low stress, and education and basic reading skills. Even with external supports, [Mother's] difficulty with frustration tolerance, impulsivity, and use of anger and aggression as a coping mechanism will make parenting, particularly for a young child, challenging.

Kirk opined that Mother's intellectual disability would not change dramatically within the next 16 years and would most likely continue to affect her until A.G. reached adulthood. One of his concerns about Mother's being able to visit with A.G. was that "she would run with him, just take off right out the door." Kirk was also concerned about Mother's erratic behavior around a newborn, as well as her impulsivity and inability to control her emotions. Although Mother was on psychotropic medication to help control some of her behaviors, Kirk observed that "[t]here's only so much that the medication can do."

Kirk also opined that Mother's parental rights to A.G. should be terminated for A.G.'s safety because of Mother's aggression. He stated that even if Mother's aggression were not aimed at A.G., the situation could be dangerous for the child. Kirk said that although Mother had a good side and that "deep down[,] she has good intentions," he believed her mental capability prevented her from making good choices, noting that "[Mother] has displayed that her needs come first before anybody else's."

14

Kirk noted that when under close supervision, Mother could cook meals for herself, clean, take care of herself appropriately, and do laundry. So, when Mother could be supervised and directed, she was able to show the ability to parent, but he cautioned that "as far as taking it on her own, no." He also added that her ability to understand different cues from a child's crying—such as for diaper changes or hunger—would require assistance and direction.

Kirk recounted that Mother had been in the psychiatric hospital when her pregnancy was identified. He described his difficulty in explaining to her what being pregnant meant. When he tried to explain that she was going to have a baby and would need to change her behaviors, his words "didn't register" with her. And he related that while pregnant, she had vacillated between wanting the baby and not wanting it.

DFPS had located a Home-and-Community-based Services (HCS)[10] placement for Mother even though there were only a very limited number of such homes in

---

[10]HCS is a program that "provides individualized services and supports to persons with intellectual disabilities who are living with their family, in their own home[,] or in other community settings, such as small group homes." Tex. Health & Human Servs., *Home & Community-based Services (HCS)*, https://www.hhs.texas.gov/providers/long-term-care-providers/home-community-based-services-hcs (last visited Feb. 10, 2022). Witnesses also used the acronym "ACH" to refer to Mother's home. ACH Child and Family Services is a DFPS contractor providing supervised independent living. Tex. Dep't of Family & Protective Servs., *Supervised Independent Living (SIL) Contracted Providers*, https://www.dfps.state.tx.us/Child_Protection/Youth_and_Young_Adults/Transitio nal_Living/Extended_Foster_Care/SIL_Contracted_Providers.asp (last visited Feb. 10, 2022). Kirk distinguished a residential treatment center (RTC), with its dorm-like

15

Texas, and HSC is not typically available to anyone under the age of 18. According to Kirk, DFPS went "above and beyond to get [Mother] placed into this type of home," and he believed that the HCS placement was presently the best home for Mother. However, Mother would not be able to bring a child to live with her in the HCS home. DFPS's plan for Mother was to have a guardian appointed for her when she turned 18 years old because DFPS had already determined that she would not be capable of living on her own.

Mother had never had any in-person visitations with A.G.—a group decision made by Kirk, his supervisor, and his program director and based in part on Mother's history of having physically attacked adults and other children.[11] He stated, "We considered all types of what would be the best [as far as visitation], and the bottom line of it was that we had a child that was incapable of controlling her emotions." He acknowledged on cross-examination that other than Mother's history, there was no evidence that she would actually harm A.G., and he stated that Mother had received one-on-one parenting training through her therapist, not through the traditional parenting classes that a parent would normally go through.

---

setting of four children to a room from an HCS home-type setting, which was a long-term, "life-long" placement that would provide Mother with her own room, space for her belongings, and fewer restrictions.

[11]Mother had a couple of FaceTime visits with A.G. during the pandemic.

### 3. Neneh Bah's Testimony

Bah testified that she ran the ACH home where Mother had lived since March 18, 2020, and where she was living at the time of the trial.[12]  Petitioner's Exhibits 2, 3, 4, and 5—all demonstrating Mother's propensity toward violence—were admitted into evidence during Bah's testimony.

Petitioner's Exhibit 2 was a photograph of the bloodied scalp and forehead of Betty Secka, one of the ACH home's staff, after an assault by Mother.  Petitioner's Exhibit 4 was a photograph of a window Mother had broken during the same week that she had assaulted Secka.  No charges were pressed against Mother because she had been in Secka's care for a long period of time with no other such behaviors.

Petitioner's Exhibit 3 was a photograph of a large rock that Mother had thrown into Bah's vehicle.  Because the vehicle's window had been down, the vehicle was not damaged, but the rock had hit Bah on the arm.  Bah said that on the same day that Mother threw the rock into her car, she also threw a rock that hit the bumper.  Petitioner's Exhibit 5 was a photograph of Bah's damaged car bumper.

Bah testified that Mother had not tried to run away since joining the ACH home in March 2020, although she had tried to leave the premises twice without permission—the first time had involved the rock-throwing incident and the second

_____

[12]Bah said that Mother had been approved to stay in the ACH home for as long as she needed care.

17

time had been after a caseworker visit. Mother had also left school when she was not supposed to, but Bah said, "[T]hat's a different environment."

Bah reported that Mother performed her own chores—laundry, washing dishes, and making her bed—in the home but was given reminders and had to follow a schedule. And Bah described Mother as very compliant with the schedule.

According to Bah, Mother is very sensitive about her family and that when she receives information about A.G. and other family members, she gets upset. Bah said that Mother expressed the desire to return to her family and to spend time with A.G.

Bah's outlook regarding Mother was more positive than Kirk's. She noted that Mother had had a period of nine to ten months with no bad behavior, that Mother loved children, and that Bah was not concerned for her own children's safety when Mother occasionally spent time around them.[13] Bah also stated that during Mother's time in the ACH home, Mother had never displayed any type of aggressive behavior towards Bah's children, that Mother's behavior had improved, and that Mother had matured.

Bah admitted that she had never seen Mother with A.G. so she did not know if Mother would be dangerous to him. According to Bah, DFPS had not provided Mother with any parenting courses, nor had Mother ever mentioned any parenting instruction when discussing her therapy with Bah. Bah said that she did not think

---

[13]Bah had a two-year-old child and a one-and-a-half-year-old child at the time of the hearing.

Mother had had any type of visitation—electronic, telephonic, or otherwise—with A.G. and that Mother's caseworker (not Kirk) had not allowed Mother to send Christmas gifts to A.G.

### 4. Alyssa Bottlinger's Testimony

Bottlinger was A.G.'s permanency specialist with Our Community Our Kids (OCOK).[14] Bottlinger testified that A.G., who was almost two years old, had been in the same foster care placement since his birth, and his foster parents wanted to adopt him. Although he had experienced some medical and development problems, A.G. was improving. He had been diagnosed with asthma and had received breathing treatments as needed from his foster parents. He had undergone a successful surgery to install tubes in his ears, was receiving Early Childhood Intervention (ECI) services for speech delay, and was becoming more verbal. Bottlinger reported that A.G. "can put two or three words together. That's happened recently, and that helps him to express himself." But she did not think he would be able to express his needs if he were having an asthma attack.

Bottlinger was not A.G.'s original caseworker, and she did not create Mother's service plan. By the time Bottlinger was assigned the case, DFPS's permanency goal for A.G. had changed from family reunification to adoption by foster parents.

---

[14]OCOK is a contractor that performs DFPS's conservatorship case work. Bottlinger stated that OCOK visits the child and parents, creates a family plan, and helps them with services, "as well as making sure all the kids' needs are met, [and] attend[ing] court hearings."

Mother's service plan required housing, therapy, parenting classes, a substance-abuse assessment, drug testing,[15] a psychological evaluation, a psychiatric evaluation, medication management, refraining from criminal activity, and participating in a preparing-for-adult-living (PAL) course. Bottlinger was not certain whether an uncharged assault would violate the no-criminal-activity portion of Mother's service plan, but she opined that it would because Mother had been arrested for assault.

When she spoke with Mother about parenting, Mother told her that she had watched YouTube videos and television "so she knows how to be a parent." Mother related to Bottlinger that parenting entails feeding, bathing, and dressing the child and buying him nice things, and Bottlinger acknowledged that Mother could "probably" learn what parenting entailed through a parenting class or counseling sessions specifically addressing an infant or child's needs. However, Bottlinger was not part of the case during the time that parenting classes might have been offered to Mother.

During cross-examination, Bottlinger acknowledged that Mother had completed her psychological evaluation, had attended therapy and PAL classes, and had maintained contact with DFPS as required by her service plan, and then she described areas where Mother had fallen short:

> Q. So her only deficiencies are the parenting classes and then some questionable criminal, in quotes, behavior. Correct?

---

[15]Bottlinger was unaware of any drug-related concerns about Mother and agreed that the substance-abuse assessment and drug-testing requirement could probably have been removed from Mother's service plan.

A. Correct. Along with housing.

Q. So let's say we have a 17-year-old who has a -- a high IQ, how would a 17-year-old secure their own housing?

A. I'm not sure from my experiences where I have not encountered a minor parent.

Q. But do you think that just because she's a minor her rights should be terminated?

A. It's not based off of her being a minor completely.

Bottlinger recommended terminating Mother's parental rights under Subsection (O) of Section 161.001(b)(1) (the failure-to-comply-with-court-orders provision) and Section 161.003 (the mental-illness-or-emotional-deficiency provision) and as in A.G.'s best interest because of the safety concerns that Mother posed to him. According to Bottlinger, DFPS wanted a safe and appropriate permanent placement for A.G. and "the placement that he's in right now is best suited to provide that for him."

Bottlinger visited with Mother once a month, sometimes in person and sometimes virtually,[16] and their meetings were ordinarily short—around 15 minutes. According to Bottlinger, at those meetings, Mother was "usually upset with [her]." Bottlinger said that Mother "frequently discusses that she's mad at CPS for taking her family away from her" and that when they talk about A.G., "it just brings up all of

---

[16]Bottlinger stated that her last two visits with Mother had been "via FaceTime due to COVID exposure for both of us."

21

those past emotions from what she's been through."[17]  Bottlinger said that she did not think that Mother believed DFPS had her best interest at heart, and she acknowledged that Mother's anger "to some degree" might be justified as to her lack of access to A.G.[18]

Bottlinger testified that while she was on the case, she had not allowed visits between Mother and A.G. and had been advised that such visits should not be allowed, stating, "I was told that there was a court order put in place that suspended the visitation."  She stated that she had seen nothing to support asking to change the order.  Because of the court order, Bottlinger had not allowed Skype visits or other forms of telephonic communication between Mother and A.G.  But contrary to Bottlinger's testimony, the record reflects that on September 2, 2020, the trial court ordered Mother to have supervised visitation with A.G. if she followed specific steps to have her supervision level reduced.  The record also reflects that the trial court ordered supervised visitation on April 16, 2021.

Bottlinger had never seen Mother's bedroom in Bah's home but said that Bah had told her that they tried to limit furniture in the home because when Mother becomes violent, she tends to throw things.  However, Bottlinger admitted that she

---

[17]As to A.G.'s father, Bottlinger said that Mother had told her that A.G.'s father's name was Jordan, that Mother did not know his last name or where he lived, and that Mother could not describe what he looked like.

[18]At some of their in-person meetings, Bottlinger brought Mother photographs of A.G. for Mother to keep.

had never personally witnessed a physical altercation between Mother and anyone else.

### 5. Margaret Ray's Testimony

Ray, an OCOK permanency supervisor who supervised Bottlinger's work for the portion of the case involving A.G., testified that she had not seen or met with Mother prior to trial but had reviewed Mother's file and the services that had been offered to Mother. Based on her review of Mother's and A.G.'s files, she did not think that Mother had successfully completed her therapy requirement, and she expressed concern that while Mother had engaged in therapy and had undergone psychological and psychiatric evaluations, "she has not made any observable changes to her behavior that would create a safe environment for [A.G.]."

Ray explained that DFPS had opted to seek termination of Mother's parental rights to A.G. because Mother had not made progress on her service plan and to give A.G. permanency:

> If we were to have [permanent managing conservatorship] of [A.G.] without the option of adoption, it's possible that [A.G.] would go through a similar circumstance to what [Mother] went through with frequent placement changes. His foster parents that he's been with for almost two years could decide not to renew their license, they could move out of state, something like that, versus if they adopt him and he's legally their child, he has more security in their care.

In other words, if DFPS were awarded permanent managing conservatorship without termination of Mother's parental rights, A.G. could potentially stay in DFPS's care

until he turned 18 years old, while termination of Mother's parental rights opened the door for stability through adoption by his foster parents.

Ray acknowledged that DFPS had housing available for minors who had a child in foster care but explained that those placements were for minors in DFPS's care who tended to be self-sufficient, who had few-to-no special behavioral or emotional concerns, and who were able to be their child's primary caretaker with foster-parent guidance. Mother did not qualify based on her situation, and the case's focus was on A.G. and his best interest. Ray stated that her concerns centered around A.G.'s need for safe and appropriate care and a safe and appropriate home, and, through no fault of her own, Mother lacked the ability to develop the skills necessary to provide for these needs.

Ray explained that Mother had been offered psychiatric and psychological services, and through her school program, she "is offered services for behavior such as friend making, anger control, that sort of thing." She also confirmed that Mother attended "day hab" when there was not a caregiver present at the HCS home because Mother could not be at the HCS home "independently." And while Mother's service plan included parenting classes, Ray acknowledged that Mother had not been offered those classes while Ray and Bottlinger were on the case.

### 6. Julia Bishop's Testimony

Bishop testified that she had been Mother's OCOK permanency specialist since February 2021, "the same as [Bottlinger] was for [A.G.]" Bishop saw Mother

twice a month, usually only for 15 minutes at a time "because she shuts down." The longest time that Bishop had spent with Mother was when she and Mother's CASA volunteer took Mother to dinner for her birthday, an outing that, according to Bishop, "went really well."

Bishop said that she understood that when Mother turned 18 years old, her ACH home could take over her guardianship. She opined that Mother was not capable of living on her own and would "always need some kind of supervision." She had seen Mother's bedroom and said, "It's just a simple bed, a dresser and a TV on the wall." Mother kept it clean and well-maintained, and "she takes care of her hygiene. She's very conscientious of how she looks and her hair and wants -- you know, her nails and how she dresses." The home's staff cooked for residents, and Bishop had no concerns about Mother's ability to take care of her basic personal needs.

Bishop addressed Mother's proclivity toward running away. She related that Mother had tried to run away from school a couple of weeks before trial, and then, within a week, when Bishop had gone to Mother's school, she discovered that Mother had tried it again:

> She was trying to run away when we got there. She wasn't in class. She was in a foyer, and there was about six staff members trying to control her. And she was cursing and wanting to leave. She hated the school. And when we showed up, because she recognized me and the CASA supervisor, then she kind of calmed down and we were able to get her in a room and talk to her and get her back to class.

Mother told her that she wanted to go to a different school but could not explain why. Bishop added that the next time she went to see Mother at school—which was in the two weeks prior to trial—Mother "was back at it again and she destroyed a classroom, and they had to restrain her." Bishop attributed this behavior to Mother's anger "about her family, about her son, her rights being taken." She did not think that Mother understood how or why she was initially removed from her parents, then adopted, and then removed again. Although Bishop had tried to explain it to Mother "like you would explain to a young . . . child," Mother did not understand and thought CPS lied to her.

Bishop also had Mother's brother on her caseload, although by the time of trial he had signed himself out of care because he had turned 18. She explained that he was "in trial independence right now," and that she had discussed A.G. with him. Bishop reported that Mother's brother "wants to be a part of his nephew's life but he knows he can't take care of him and he knows [Mother] can't take care of him.[19] And he's told [Mother] that in their visits."[20]

Bishop said that Mother had experienced "some sexual impropriety" when she first came into foster care and had been a victim of sexual abuse during the time she

---

[19]Bishop testified that Mother's brother was not an option for A.G.'s placement and "probably not" an option to care for Mother.

[20]Mother's visits with her brother had been via Zoom since Bishop's assignment to the case.

ran away that resulted in her pregnancy with A.G. She acknowledged on cross-examination that Mother was supposed to have received trauma therapy through MHMR "[a]nd that never materialized," but that Mother was being assigned a new counselor who was "getting it rolling."

Mother had consistently made it clear to Bishop that she wanted A.G. When asked whether she thought it would be a danger to A.G. if Mother were allowed to have supervised contact with him, Bishop replied, "I honestly don't know." Bishop agreed that supervised visitation at an OCOK office might be possible. However, she had visited Mother not long after Mother's assault on Secka, when Mother acknowledged that she had caused Secka's injuries. Bishop testified, "[Mother] doesn't say a whole lot, but she laughs about punching people and thinks it's funny."

### 7. Kathy Childress's Testimony

Childress had been a teacher for 14 years and a CASA for two years, and she testified that she had been A.G.'s CASA volunteer since his birth. Childress visited A.G., who had been in the same foster home through the entire case, each month in person or through Zoom or FaceTime; sometimes she visited with him several times a month. But Childress had only met Mother in the courtroom and had never had the opportunity to speak with her by phone or other means.

Childress supported terminating Mother's parental rights to A.G. so that he could be adopted by his foster parents. She explained,

[A]s far as [A.G.] is concerned in his foster care home, he has been given every single opportunity to develop, and he's done it extremely well, I mean, a good job as far as developing socially, academically as far as things that they're working with him with. There isn't anything that I can imagine as a parent or a former teacher that he wouldn't -- you know, that he hasn't been exposed to that has not helped him in some way. So he has a very loving, caring home with siblings and parents that love him and surrounding community.

## 8. Holly Stewart's Testimony

Stewart, Mother's CASA volunteer at the time of trial, testified that she had been a CASA volunteer for ten months, and Mother was her first case. During her monthly visits with Mother, which lasted from 30 minutes to four hours, she had never witnessed Mother being physically violent, experiencing anger outbursts, or making suicidal threats. Stewart believed that Mother had progressed during the time that she had been Mother's CASA volunteer, and while she was not sure that Mother could provide a safe and stable home for A.G. before his 18th birthday, she stated that she thought Mother "would love to be given that opportunity to do so."

But despite Mother's desire to parent A.G., Stewart acknowledged that "[b]eing a parent myself, I think there's a lot of skills that [Mother] would have to obtain in order to be a parent." She was optimistic that Mother could develop some parenting skills if parenting courses and intensive parenting training were offered to her. Nevertheless, she agreed that Mother would require supervision to parent A.G.

Stewart opined that supervised visitation with A.G. would be appropriate but pointed out that it had not been offered to Mother. Stewart attributed Mother's anger

28

to her separation "from every single one of her family members" and her lack of opportunity to be in A.G.'s life. Stewart did not believe that DFPS had made reasonable efforts to return A.G. to Mother.

When asked whether she thought Mother's mental or emotional illness or mental deficiency would render her unable to provide for A.G.'s needs until his 18th birthday, Stewart replied, "I don't know if I'm qualified to answer that question. I -- I think everyone should be given an opportunity." She expressed that Mother should have been given an opportunity and pointed out that there were appropriate safeguards that would have made it feasible to give Mother that opportunity. As to Mother's thoughts on her ability to parent, Stewart said, "[T]here are periods where she thinks she can do it and then there are periods where she has some doubt whether she can do it. And I think -- I think we all have that."

Stewart confirmed that she understood that Mother was eligible to remain in the ACH home for her lifetime based on her diagnoses and inability to care for herself.

### 9. Ad Litem's Recommendation

A.G.'s attorney ad litem expressed disappointment in how DFPS had handed the case but nevertheless recommended terminating Mother's parental rights. The ad litem stated that she had "been pretty angry with the State in this case because . . . [she] ha[d] wanted to see at least some attempts for evidentiary purposes of some type of access between [A.G.] and [Mother]." In sum, her position was that she believed

termination is "in the best interest because of who the current foster family is," but she did not "appreciate the way the State handled this case."

### 10. Mother's Psychological Evaluation

The psychologist who conducted Mother's November 19, 2020 psychological evaluation also considered Mother's previous four psychological evaluations for background, and those showed that Mother had a moderate intellectual disability and suffered from disruptive mood dysregulation disorder. Prior reports also noted that Mother had a severe conduct disorder. Mother's March 28, 2018 evaluation estimated her intellectual functioning to be within the below-average range, with a full-scale IQ of 43, while the 2020 evaluation estimated it to be 53. Mother's basic reading, math computation, sentence comprehension, and spelling were at a first-grade-level equivalent, and her motor skills, social and communication skills, personal and community living skills, and broad independence skills were that of an age equivalent of a not-quite-six-year-old child.

According to the evaluation, Mother's conditions were treated with mood-regulating medication, including Hydroxyzine, Risperidone, and Oxcarbazepine.[21]

---

[21]Hydroxyzine is prescribed for anxiety. *In re R.M.*, No. 09-16-00022-CV, 2016 WL 3564458, at *2 (Tex. App.—Beaumont June 30, 2016, no pet.) (mem. op.). Risperidone is a psychotropic mood stabilizer used to relieve or improve symptoms such as hallucinations, irrational beliefs and fears, disorganized thinking, severe anxiety, apathy, emotional withdrawal, social withdrawal, and mood swings. *In re J.P.-L.*, 592 S.W.3d 559, 569 n.11 (Tex. App.—Fort Worth 2019, pet. denied). Oxcarbazepine is an "atypical antipsychotic." David R. Katner, *The Mental Health*

Mother's behaviors—aggression, sexually inappropriate and provocative behaviors toward adult males, self-injurious behaviors, and property destruction—had resulted in multiple psychotic hospitalizations. Mother had also reportedly experienced auditory hallucinations.

Mother had been removed from her parents' custody in 2000 "due to neglect subsequent to parental substance abuse," but she was returned to CPS custody by her foster-turned-adoptive mother in 2015 "[a]fter an inappropriate relationship with her adoptive brother." When returned to foster care in 2015, Mother experienced 16 different placements, including foster homes, residential treatment centers, and emergency shelters. In February 2019, her pregnancy was discovered when she was admitted to an emergency shelter pending another placement. After she gave birth, the baby was placed in foster care because of Mother's aggressive behaviors and mental health needs. According to what Bah had reported for the evaluation, Mother continued to display behavioral problems in home, community, and academic settings; demonstrated poor boundaries and aggression; and "has some difficulty making friends and prefers to play with younger children." Based on Bah's description, Mother's emotional distress—including experiencing upsetting thoughts and social problems—as well as her defiant and aggressive behaviors, academic difficulties,

---

*Paradigm and the Macarthur Study: Emerging Issues Challenging the Competence of Juveniles in Delinquency Systems*, 32 Am. J.L. & Med. 503, 550 n.272 (2006).

hyperactivity and impulsivity, compulsive behaviors, and her potential for violence were all "very elevated."

Based on Mother's cognitive functioning, the psychological evaluation's summary rated her intellectual level within the lower extreme range, and in terms of her social-emotional functioning, the report indicated that she had a "significant history of behavioral difficulties including verbal and physical aggression, limited frustration tolerance, poor impulse control, and poor social and sexual boundaries," and "[s]he continues to present with difficulty regulating her emotions and experience[s] periodic outbursts of anger and aggressive behavior."

If Mother were to reunite with A.G., the evaluation recommended that Mother be provided "daily support, intensive training with parenting skills and a demonstrated sustained improvement in anger management and reduction in aggression."

## C. Trial Court's Fact Findings

Upon Mother's request, the trial court filed findings of fact and conclusions of law. The trial court made the following findings of fact:

- [Mother] is a minor child and [DFPS] is [her] Sole Managing Conservator[;]

- [Mother] appeared at the final hearing . . . [and] chose to leave the proceedings after the testimony of the first witness[;]

- [Mother] became pregnant with [A.G.] while on runaway status with [DFPS] at the age of 15[;]

- The parental rights of [Mother's] parents were terminated when she was 5 years old and [Mother] has no family support to assist her with [A.G.;]

- The only relative that [Mother] still maintains regular contact with is her brother who was recently also a child in the conservatorship of [DFPS;]

- [Mother] got into a car with two unknown males and had sexual intercourse with a man she did not know resulting in the conception of [A.G.;]

- [Mother] was unable to provide a full name, phone number, address, or any identifying information of the putative father of [A.G.;]

- [Mother] completed two psychological evaluations, and both determined her overall IQ score to be 43[;][22]

- [Mother's] psychological evaluation rated the following behaviors as very elevated: emotional distress, upsetting thoughts, social problems, defiant/aggressive behaviors, academic difficulties, hyperactivity/impulsivity, perfectionist and compulsive behaviors and violence potential indicator[;]

- [Mother] has been hospitalized over 15 times in a psychiatric hospital and 29 times in [] Residential Treatment Centers[;]

- [Mother] has run away from her placement over 20 times since 2015[;]

---

[22]As mentioned above, Mother's 2020 psychological evaluation stated that her IQ composite score was 53.

- [Mother] was placed in 4 specialized Home and Community Based Services foster homes which broke down[;]

- [Mother] had suicidal ideations during pregnancy and after [A.G.'s] birth . . . [;]

- [Mother] is currently taking psychotropic medications[;]

- [Mother] has assaulted one teacher, one student, and one of her own care provider[s] since . . . [A.G.'s] birth[;]

- [Mother] has destroyed school property in an anger outburst[;]

- [Mother] has been placed and accepted into a long-term HCS home for as long as she will need care as an adult, potentially for her lifetime due to being deemed intellectually disabled[;]

- [Mother] lives in a group home that will not allow her to have [A.G.] placed with her[;]

- [Mother] must go to a type of daycare for adolescents called dayhab for care when not in school[;]

- [Mother] needs assistance completing daily chores and self-care tasks[;]

- [Mother] has not had visitation with [A.G.] since his birth[;]

- [Mother] has criminal assault charges pending in Dallas, Texas[;[23]]

---

[23]Kirk testified that Mother had been arrested for and charged with assault but that "[a]fter discussing with the District Attorney in Dallas and talking with the foster mother, she ended up dropping those charges." Based on the record, it does not appear that Mother had pending charges at the time of the trial.

- [Mother] has sudden and unexpected mood swings and has been physically and verbally aggressive and struggles with impulse control[;]

- [A.G.] has asthma and requires medication and observation for symptoms[;]

- [A.G.] is under two years of age and relies on his care providers for all his needs[;]

- [Mother] was unable to complete all her services under the Family Plan of Service[;]

- [Mother] did not complete a parenting course[;]

- [Mother] engaged in criminal activity on three separate occasions, assault, in violation of the Family Plan of Service[;]

- [A.G.] is in an adoption motivated foster home, [and] he has resided in the same home since removal.

The trial court then made the same findings that it made in the order as to Section 161.001(b)(1)(O) (failure to follow court orders), Section 161.003 (mental illness or deficiency), and the child's best interest.

## D. Family Code Section 161.001(b)(1)(O)

Under Section 161.001(b)(1)(O), the trial court may terminate the parent-child relationship for failure to follow court orders if it finds by clear and convincing evidence that the parent has

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [DFPS] for not less than nine months *as a result of the*

*child's removal from the parent under Chapter 262 for the abuse or neglect of the child.*

Tex. Fam. Code Ann. § 161.001(b)(1)(O) (emphasis added). In her first issue, Mother argues that there was no evidence suggesting that she had ever abused or neglected A.G. or that there was ever even the opportunity for it to happen because he was removed from her shortly after his birth.[24]

No one testified that Mother had abused or neglected A.G. in utero or in the three days after his birth.[25] *Cf. T.B.*, 2017 WL 5180067, at *4 (observing that the

---

[24]Mother further argues that, objectively, she completed her service plan's therapy requirement and was thwarted in completing the parenting-class requirement because OCOK (as DFPS's contractor) never offered it to her. She also complains that the undisputed evidence established that OCOK was in control of Mother's home environment, had placed her where A.G. could not live with her, and had made no attempts to find a home where Mother and A.G. could live together. Family Code Section 161.001(d) prevents a court from ordering termination under Subsection (b)(1)(O) if a parent proves by a preponderance of the evidence that the parent was unable to comply with a court-ordered service plan, despite making a good faith effort, and the failure to comply was not the parent's fault. Tex. Fam. Code Ann. § 161.001(d); *see, e.g., In re T.B.*, No. 09-17-00230-CV, 2017 WL 5180067, at *3 n.3 (Tex. App.—Beaumont Nov. 9, 2017, no pet.) (mem. op.) (discussing subsection in dicta and stating it "amounts to an affirmative defense"). If a parent explicitly challenges the sufficiency of the evidence under Subsection (O)—but not Subsection (d)—and yet argues reasons for not complying with the court order, the court should address Subsection (d) as part of any analysis of the termination of parental rights under Subsection (O). *See In re Z.M.M.*, 577 S.W.3d 541, 542–43 (Tex. 2019). However, based on our disposition of Mother's first issue, we need not reach these additional arguments. *See* Tex. R. App. P. 47.1.

[25]In the two affidavits in support of removal attached to DFPS's original petition, a DFPS investigator alleged that DFPS had received a report alleging neglectful supervision of A.G. by Mother because she "show[ed] little interest in caring for [him] and does not seem to be bonding with [him]" and did not appear to understand the child's physical cues and that Mother's obstetrician felt that Mother

appellant-mother had endangered her child by using drugs while she was approximately five months pregnant, supporting a finding that the child had been removed under Subsection (O) for abuse or neglect); *In re L.V.*, No. 13-10-283-CV, 2011 WL 676020, at *5 (Tex. App.—Corpus Christi–Edinburg Feb. 24, 2011, no pet.) (mem. op.) (upholding termination of appellant-father's rights on endangering-environment ground when he knowingly failed to protect children in utero from mother's cocaine use). Because DFPS produced no evidence to support a finding that Mother had abused or neglected A.G. during the three days prior to his removal after his birth, causing his removal from her, we sustain her first issue.

### E. Family Code Section 161.003

Having sustained Mother's first issue, we must now consider her second issue, in which she challenges the legal and factual sufficiency of the evidence to support terminating her rights under Section 161.003.

A parent's mental illness or deficiency is not, by itself, grounds for terminating the parent-child relationship. *In re E.R.*, 555 S.W.3d 796, 807 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Rather, to terminate parental rights under Section 161.003, the trial court is required to find that: (1) the parent has a mental or emotional illness or a mental deficiency that renders her unable to provide for the child's physical,

---

was unable to care for herself or the child. Kirk completed the other affidavit, in which he stated that Mother's obstetrician had indicated that Mother was not capable of safely parenting the child even with supervision. Mother's obstetrician did not testify at the trial.

emotional, and mental needs; (2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the child's 18th birthday; (3) DFPS has been the child's temporary or sole managing conservator for at least six months preceding the date of the hearing on the termination; (4) DFPS has made reasonable efforts to return the child to the parent; and (5) the termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.003(a)(1)–(5). Mother specifically challenges the trial court's findings under Subsections (1), (2), (4), and (5). We combine our review of Subsection (5) with our best-interest analysis in Mother's third issue.

### 1. Subsection (1)

Mother asserts that the psychological evaluation and testimony at trial do not establish under Subsection (1) that her mental or emotional illness or mental deficiency establish an inability for her to provide for A.G.'s physical, emotional, and mental needs but rather only that she will face additional challenges and need additional support.

We disagree. Based on this record, the trial court could have found by clear and convincing evidence that Mother had both a mental or emotional illness and a mental deficiency, both of which effectively precluded her from providing a physical home for A.G. (because her group home did not allow children), from providing for A.G.'s physical safety (because of her impulsivity and violence), and from providing for A.G.'s physical care as to his asthma (because of her inability to care for herself

38

without supervision). *See E.R.*, 555 S.W.3d at 808 (upholding termination under Section 161.003 when appellant-mother had an IQ of 52, read at a second-grade level, was unable to demonstrate a basic understanding of parenting strategies, and appeared to lack the capacity to develop such knowledge and skills). We overrule this portion of Mother's second issue.

## 2. Subsection (2)

Mother likewise complains that under Subsection (2), DFPS failed to establish that she would be unable to parent and that her illness or deficiency would continue to render her unable to do so until A.G.'s 18th birthday. Mother points out that her 2020 psychological evaluation and some witness testimony indicated that her conditions were improving and that she had the potential for further improvement.

However, Section 161.003 does not require scientific certainty that a parent's mental illness or deficiency will continue until the child is 18; it only requires a reasonable probability. *Id.* (holding evidence of a lifelong intellectual disability supported termination under Section 161.003). Here, Mother ignores the vast amount of evidence showing that despite perhaps having made some modest improvements, she faced being in the lifelong care of others and that some of her recent activities resulted from her inability to properly manage her emotions, even when medicated. During recent years, Mother's impulsive behavior and desire for attention—particularly sexually inappropriate attention—had led her to run away frequently, to engage in dangerous behaviors, including sexual intercourse with the stranger who

39

fathered A.G, and to commit more than one assault. *See In re B.L.M.*, 114 S.W.3d 641, 648 (Tex. App.—Fort Worth 2003, no pet.) (stating that "in all reasonable probability" does not mean "beyond a reasonable doubt"); *see also In re D.R.*, No. 02-06-00146-CV, 2007 WL 174351, at *1, *7 (Tex. App.—Fort Worth Jan. 25, 2007, no pet.) (mem. op.) (noting that a parent with a severe intellectual disability need not know her conduct is dangerous to support termination under Section 161.001(1)(E)).

Because the trial court could have found by clear and convincing evidence that, in reasonable probability, Mother's illnesses and deficiencies would continue to render her unable to provide for A.G.'s needs until his 18th birthday, we overrule this portion of Mother's second issue.

### 3. Subsection (4)[26]

Mother argues that as to Subsection (4), DFPS failed in its entirety in that "almost immediately after the birth of A.G., [DFPS] sought to prevent [her] from ever having any contact" despite the trial court's orders that allowed her to have supervised visits. Mother argues, "[T]he clear and overwhelming evidence at trial establishes that [DFPS] made no efforts, and in some cases consciously refused to make efforts, to return A.G. to [Mother]."

---

[26]No one disputes that DFPS was A.G.'s managing conservator for at least six months during the pendency of the case, and Mother does not challenge the trial court's finding under Subsection (3).

Implementation of a family service plan by DFPS is generally considered a reasonable effort to return a child to a parent. *See E.R.*, 555 S.W.3d at 808–09. Further, the record reflects that DFPS made its various decisions in what it considered A.G.'s best interests and that some of its efforts were likely hampered by the limitations and restrictions imposed in response to the Covid-19 pandemic.[27] And there was disputed testimony about whether Mother had received parenting-skills information during her therapy sessions. The trial court was entitled to assess the witnesses' credibility and to determine, based on clear and convincing evidence, that DFPS had made reasonable efforts under this case's particular circumstances. Accordingly, we overrule this portion of Mother's second issue.

---

[27]Mother's case is not isolated in having been affected by the pandemic. *See, e.g., In re A.D.A.*, No. 13-21-00229-CV, 2022 WL 89186, at *8–9 (Tex. App.—Corpus Christi–Edinburg Jan. 10, 2022, no pet. h.) (mem. op.) (noting that some of appellant-father's services were halted during the pandemic but that he did not testify about how he planned to resume them); *In re B.N.D.*, No. 04-21-00286-CV, 2021 WL 6127883, at *6 (Tex. App.—San Antonio Dec. 29, 2021, no pet. h.) (mem. op.) (noting that services were made available virtually to appellant-mother while she was incarcerated and during the pandemic); *In re P.W.*, No. 02-21-00219-CV, 2021 WL 6068944, at *1 (Tex. App.—Fort Worth Dec. 23, 2021, no pet. h.) (mem. op.) (noting that services were available virtually during the pandemic); *In re M.M.M.*, No. 01-21-00269-CV, 2021 WL 5365102, at *6 (Tex. App.—Houston [1st Dist.] Nov. 18, 2021, pet. denied.) (mem. op.) (noting that CASA volunteer could not observe visits between child and parent because of pandemic restrictions); *T.M. v. Tex. Dep't of Fam. & Protective Servs*, No. 03-21-00174-CV, 2021 WL 4692471, at *4 (Tex. App.—Austin Oct. 8, 2021, no pet.) (mem. op.) (recounting parent's testimony about depression due to loss of custody, deaths of several family members, and the pandemic).

## F. Best Interest of the Child

In the remaining portion of her second issue and in her third issue, Mother argues that the evidence was legally and factually insufficient to support terminating her parental rights as in A.G.'s best interest.

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).[28] In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)    the [child's] desires . . . ;

(B)    the [child's] emotional and physical needs[,] . . . now and in the future;

---

[28]The primary focus of a termination-of-parental-rights suit is protecting the *child*'s best interest, *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003), even if the child's parent is also a child. *See In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied) ("It is the child's best interest and not the parent's best interest that the statutes pertaining to parental terminations are intended to promote.").

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F) the plans for the child by these individuals or [, if applicable,] by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I) any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* A parent's mental capacity is probative of the best interest determination in a termination-of-parental-rights case because her mental issues are relevant to her ability to care for her child's physical and emotional needs throughout the child's life. *J.P.-L.*, 592 S.W.3d at 582–83.

Mother argues that Kirk's testimony that it would be hard for her to raise a child was insufficient when "it is well known that raising a child is hard for any parent, and particularly for one who is 17." She contends that Bottlinger's testimony about Mother's running away from school and engaging in physical altercations and Ray's testimony that it would be in A.G.'s best interest to terminate Mother's parental rights were not based on personal knowledge. Mother points out that "[n]othing in *Holley*, or in any other portion of Texas law, provides for termination being in the best interests of a child because a foster placement is a nicer option or because they are adoption motivated." Mother contends that because she is also under DFPS's care, supervision, and control, "any failure of [Mother] which would go to best interests would be a failure of [DFPS] to provide [Mother] resources to meet the needs of A.G."

The record reflects that A.G. suffers from asthma, that Mother's own medications are managed for her, and that it is unlikely that Mother could successfully manage A.G.'s asthma medication and breathing treatments. *See E.R.*, 555 S.W.3d at 809 (stating that the needier the child, the more able the parent must be). A.G. was thriving in his foster home, which was the only home he had ever known, and his foster parents wanted to adopt him. When a child is too young to express his desires, the factfinder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with his biological parent. *Id.*

44

Further, the record reflects that Mother requires supervision and care for herself and receives assistance for her intellectual disabilities, but A.G. cannot live with her in her lifelong placement. It also reflects that Mother is both impulsive and violent. Although there was some evidence that she had never harmed a small child, there was conclusive photographic evidence that she had physically injured at least one adult, as well as evidence that she had harmed other adults who caused her frustration and anger, to the point of narrowly avoiding criminal charges, and that she had harmed a fellow student. And when confronted about some of this violent behavior, Mother responded by laughing.

Accordingly, reviewed in the light most favorable to the trial court's findings, we conclude that the evidence is legally sufficient because the trial court could have reasonably formed a firm belief or conviction that terminating Mother's parental rights to A.G. was in A.G.'s best interest. *See J.P.-L.*, 592 S.W.3d at 584–86, 589 nn.31–33 (reviewing termination-of-parental-rights cases involving mentally incapacitated parents). We likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding. We overrule the remainder of Mother's second issue and her third issue.

### III. Sufficiency to Support DFPS's Appointment as Managing Conservator

In her final issue, Mother argues that the evidence is legally and factually insufficient to support DFPS's appointment as A.G.'s managing conservator.

45

If a trial court terminates the parent-child relationship as to both parents, it shall appoint a suitable, competent adult, DFPS, or a licensed child-placing agency as the child's managing conservator. Tex. Fam. Code Ann. § 161.207(a). Its primary consideration must be the child's best interest when determining issues related to conservatorship and possession of and access to the child. *Id.* § 153.002. Unlike the clear-and-convincing burden of proof necessary to support termination of parental rights, the burden of proof necessary to appoint a non-parent as managing conservator is a mere preponderance of the evidence. *In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *21 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op. on reh'g). Trial courts have broad discretion to determine what is in the child's best interest. *In re B.O.*, No. 02-16-00485-CV, 2017 WL 2590571, at *22 (Tex. App.—Fort Worth June 15, 2017, no pet.) (mem. op.).

Based on our best-interest review above, we conclude that because DFPS met its clear and convincing burden to show best interest, it follows that it likewise met the lower preponderance of the evidence burden to show best interest in the conservatorship context. *M.S.*, 2021 WL 2654143, at *21. Having terminated Mother's parental rights, the trial court did not abuse its discretion by appointing DFPS as A.G.'s managing conservator. *See id.* We overrule Mother's fourth issue.

## IV.  Conclusion

Having overruled Mother's dispositive issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered:  February 17, 2022